70 Cal.Rptr.3d 583 (2008)
158 Cal.App.4th 1102
In re LAUREN Z., a Person Coming Under the Juvenile Court Law.
Los Angeles County Department of Children and Family Services, Plaintiff and Respondent,
v.
Margaret Z., Defendant and Appellant;
John B. et al., Interveners and Respondents.
No. B197391.
Court of Appeal of California, Second District, Division One.
January 11, 2008.
Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.
Raymond G. Fortner, Jr., County Counsel, James M. Owens, Assistant County Counsel, and Jacklyn K. Louie, Senior Deputy County Counsel, for Plaintiff and Respondent.
John Cahill for Interveners and Respondents.
*584 VOGEL, Acting P.J.
This is a dependency case in which a drug-addicted mother was arrested in California and extradited to Florida. Her nine-month-old daughter, who tested positive for opiates and cocaine because her mother was breastfeeding her while using drugs, was placed with foster parents. At the mother's request, her sister did everything she could to have the child placed with her in Florida, but the Florida child welfare authorities refused to expedite the process and almost a year elapsed before the Florida family obtained a foster care license. Meanwhile and inevitably, the child (now almost three years old and a complete stranger to her Florida family) bonded with her foster parents who are eager to adopt her. The dependency court, placing the child's best interests first, terminated the mother's parental rights and designated the foster parents as the child's prospective adoptive family. The mother (still incarcerated in Florida) appeals. We affirm.

FACTS

A.
Margaret Z. gave birth to Lauren Z. in January 2005. Nine months later, a police officer investigating a report of drug activity found Margaret, Lauren and a man in a parked car, ran a check on Margaret's driver's license, and discovered a Florida warrant for her arrest for drug trafficking and grand theft charges. Margaret was arrested and booked for child endangerment as well as extradition on the Florida warrant. When interviewed that evening by the Department of Children and Family Services, Margaret said she was a heroin addict, that she had left Florida in 2003, and that she had been living in motels in California. She said her mother and sister lived in Florida, and asked that Lauren be placed with one or the other while Margaret attended a drug program. Lauren was detained and placed in foster care in Los Angeles.
A petition was filed on October 12, alleging that Margaret had failed to protect Lauren and that Lauren was at risk based upon Margaret's drug problems (in spite of her drug use, Margaret was breastfeeding Lauren). (Welf. & Inst.Code, § 300, subds. (b), (g), (i).)[1] Later that month, the Department reported that Margaret had a criminal history in Florida (theft, drug offenses, possession of a firearm, robbery, auto theft, possession of stolen property), and that Lauren's father could not be located (he never was), and recommended the usual reunification services, random drug testing, and monitored visits, all of which were ordered.
In November, the Department reported that Margaret, then 35 years old, had continuously used drugs since high school, and that she had been raised by an alcoholic mother and an abusive alcoholic stepfather. Margaret asked the Department to place Lauren with her youngest sister, Fanny A., in Florida. Fanny and her husband, an electrician, have a daughter who was then 16 months old, and they own their home in Florida. According to Margaret, Fanny was willing to care for Lauren until Margaret was released from prison and, to that end, had initiated the process to obtain a Florida foster care license.. With a view toward reunification, the Department asked the dependency court to expedite the procedures required by the Interstate Compact on the Placement of Children (the ICPC, Fam.Code, § 7900 et seq.) to determine Fanny's suitability-but based on the uncertainty about the charges pending against Margaret, *585 also recommended concurrent permanency planning. Meanwhile, Lauren had been placed with foster parents (John B. and Bruce O.) who had been pre-approved to adopt.
Margaret (in custody) appeared at a November 2 hearing and submitted on the petition. The dependency court struck some of the allegations and, as amended, sustained the petition and ordered the Department to complete an expedited ICPC investigation of Fanny.

B.
The social worker submitted the paperwork for expedited ICPC procedures to the Department's ICPC coordinator in early November 2005, but the papers were returned to the social worker because Florida requires the court's signature. The court's signature was obtained on November 18 and all of the required forms were sent to Florida by December 7, 2005.
Two days later, the Department's ICPC coordinator learned from Fanny that Margaret had been extradited to Florida. During their conversation, the ICPC coordinator explained that Fanny's home had to be licensed by Florida before California could send Lauren to her, and also explained that if Margaret was incarcerated for more than 12 months, reunification would be unlikely-in short, that Fanny would have to decide whether she and her husband were willing to become Lauren's permanent adoptive parents. Fanny, shocked and disheartened, nevertheless said her family wanted to have a relationship with Lauren and would "go through with the ICPC." She did not commit to adoption.
In response to a telephone call from Fanny and an inquiry from the Alliance for Children's Rights about expediting the process by changing the ICPC request to a "relative placement home study" (instead of foster care), the social worker explained to Fanny on January 10, 2006 that Lauren would not qualify for the federal funds for which she is eligible unless Fanny is a licensed caregiver, and that the Florida licensing process takes three months (and could not be expedited). The ICPC coordinator also told Fanny that she could forgo federal funding. When Fanny asked whether Lauren could come to her for an "extended visit," the social worker explained that the Department could not send a child to another state without ICPC approval. By that time, Fanny recognized the problem, commenting to the social worker that, "By the time we are licensed, she will have been with [her foster parents] for months. I know [it] will be traumatic for her to move." Fanny called back the next day and told the social worker that her family would forgo federal funding and obtain a relative home study in lieu of a foster care license. She still did not commit to adoption.
About two weeks later, the social worker learned from the Department's adoption coordinator that "it is important to have a licensed foster care home study on a potential ] adoptive family because the adoption home study can be completed much more quickly with a completed licensed home study"and that "Florida will not even begin the adoption home study process until Florida has been provided proof that there are no legal barriers to adoption." The social worker presented the problem to a resource team within the Department, and the decision was made to "request the expedited relative home study while continuing the foster care licensing and home study so that the relative family could still be considered for funding." At that point, the Department was "strongly focused on a secure permanent plan for Lauren" and did not support any concurrent plan that did not involve the child's *586 adoption. The social worker asked the Department's ICPC coordinator to immediately submit the expedited ICPC relative home study request to Florida.
On January 26, 2006, Florida informed the Department that it would not accept the expedited relative home study request unless the request was signed by a judge rather than a referee, and that it would not accept the request for an expedited review because it was based on a November 2005 minute order. The social worker explained the reasons for the delay, and the ICPC coordinator informed her Florida counterparts that there was no basis for questioning the referee's signature.

C.
At the same time the Department was trying to expedite the ICPC process, the social worker was trying to locate Margaret within the Florida prison system. When the social worker finally obtained a jail mailing address, she wrote to Margaret, explaining what she should do while incarcerated (enroll in 12-step and similar programs) and how to reach the Department, and asking Margaret for documentation for completed classes and programs. Margaret called the social worker on January 23, 2006, and said she was facing a maximum of 12 months in prison and possibly only probation. The social worker called the Florida state attorney's office and other agencies in St. Johns, Florida, in search of more information, but her calls were not returned.
For her part, Lauren was living with her foster parents, to whom she was very bonded. Her foster parents conscientiously attended to Lauren's medical problems, their adoption home study was completed and approved, and they maintained regular contact with Fanny, repeatedly urging her to call them directly for reports about Lauren's progress.
At a hearing held on January 31, 2006, the dependency court expressed its frustration with the ICPC process and, more specifically, Florida's intransigence at a point where time was critical. When Lauren's lawyer asked whether the court would agree to have Fanny "just come and take Lauren and we can close the case," the court explained that it could not do so without Florida's approval. The court urged the Department to do everything it could before the next hearing, and offered to make phone calls if that would help.

D.
Shortly after the January 2006 hearing, a new social worker took over Lauren's case, and in April the replacement social worker "went on unexpected medical leave and the case file was dispersed." The original social worker took charge temporarily, but the practical effect was that nothing happened between January and April in California or Florida. On April 4, Florida informed the Department that it could not complete an expedited home study before May because it needed fingerprint checks from the FBI. On April 18, Margaret called to report that she expected to be sentenced to at least some time in prison. Finally, on April 24, the Department's ICPC coordinator received word that Florida had approved Fanny's home study report, and the Department was formally notified of the approval on April 27.
In its report for the May 2006 hearing, the Department noted Margaret's preference for Lauren's placement with Fanny under a long-term guardianship but recommended against it based upon Margaret's 20-year history of drug addiction and her substantial criminal record. Assuming that Margaret received a one-year sentence, she would not have been released until May 2007, and the Department *587 viewed her hopes for reunification as unrealistic.
The Department also recommended against placing Lauren with Fanny, in part because Florida would require Fanny's family to obtain Medicaid for Lauren and to pay for any uncovered medical expenses. Because Lauren may have medical problems and developmental issues concerning speech and language due to her drug exposure, the Department had serious concerns about Fanny's ability to provide the required amount of care. More importantly, the Department was concerned that Fanny expected to rely on her mother to help with Lauren's carethe same alcoholic mother who Margaret blamed for her drug addiction (and from whose care Margaret had been removed at age 15). The Department questioned Fanny's commitment to Lauren, noting that her calls to the foster parents and the Department were to discuss the ICPC procedures, and that it was only as an "afterthought" that she ever inquired about Lauren, and concluded that Fanny, although willing to adopt Lauren if necessary, still hoped to see the child returned to Margaret and planned to take her to visit Margaret in prison. The Department did not question the Florida relatives' good intentions, but feared they might be placing Margaret's interests above Lauren's.
The Department noted that Florida had recently privatized its child welfare system, creating an upheaval in child welfare services and raising doubts about whether Lauren would "receive consistent and appropriate monitoring from Child Protective Services in the state of Florida." The Department emphasized its policy and the law, which both "are clear that children of Lauren's age deserve the most permanent and stable plan available at the earliest opportunity. In Lauren's case, this plan is clearly adoption [and it] is not appropriate to grant a guardianship, and certainly not appropriate to consider long term foster care for such a young and adoptable child." The Department noted that Lauren's foster parents had an excellent relationship with her, and were providing her with a safe and nurturing home. Given all these considerations, the Department recommended that it was in Lauren's best interest to be adopted by her foster parents.
At the May 3 hearing, the court granted the foster parents' request for de facto parent status and appointed counsel for both the foster parents and for Fanny and her husband. Margaret's lawyer told the court that Margaret would be released the next day into a treatment program, and counsel asked for additional reunification services for her. The trial court, noting that "no matter what, this is going to be a heartbreak for somebody," continued the hearing to June 6, 2006, and ordered the Department to make sure that both Margaret and Fanny would be available by telephone that day.

E.
Before the June 6 hearing, the dependency court learned that Margaret's lawyer had been mistaken and that, in fact, Margaret had been sentenced to state prison for a term of three years. Accordingly, the court found on June 6 that there was no possibility for Margaret to complete her case plan within the statutorily mandated time, that she had not stayed in touch with Lauren, and that the Department had provided adequate reunification services to Margaret. The court terminated reunification services and set a section 366.26 hearing. Although the court expressly ordered the Department to notify Margaret of her right to seek relief by writ petition, Margaret never received the notice.
By July 2006, Fanny and her husband had completed all the requirements to become *588 licensed foster caregivers. For their part, Lauren's foster parents, with whom she had by then been living for nine months, agreed to an open adoption that would include regular contact between Lauren and Margaret and Lauren's other Florida relatives. The Department's position was unchangedthat adoption by the foster parents, the only family she had ever known, was in Lauren's best interest, and that it would not be in her best interest to transfer her to a family she had never met. At a July hearing, the court denied Fanny's request for de facto parent status, but urged Fanny to visit Lauren in California (she never did) and to have regular telephone contact with the foster parents, and encouraged the foster parents and the family to find a mutually satisfactory arrangement.
In November, Fanny and the foster parents (but not Margaret) signed an Agreement For Post Adoption Contact guaranteeing Fanny's right to post-adoption visits with Lauren, memorializing Fanny's consent to Lauren's adoption by the foster parents, and allowing Margaret to visit Lauren. In court, Margaret's lawyer "join[ed] with the relatives" and thanked the foster parents and Fanny for working out the agreement.

F.
The section 366.26 hearing was held on February 7, 2007. Margaret (appearing telephonically) asked for further reunification services, objected to the termination of her parental rights, objected to the foster parents' adoption, of Lauren, and insisted that, notwithstanding Fanny's agreement with the foster parents, she wanted Lauren placed in Florida. The Departmentjoined by Lauren's lawyer recommended termination of Margaret's parental rights and adoption by the foster parents.
After noting that Lauren had just turned two, the court found that Margaret had been unable to establish a relationship with Lauren during the pendency of the case, terminated Margaret's parental rights, found Lauren adoptable, and designated the foster parents as the prospective adoptive parents. Margaret appeals.

DISCUSSION[2]
Lauren, now almost three years old, has spent all but the first nine months of her life with her foster parents. She has not seen her mother during that time, and she has never met Fanny or Fanny's family. Margaret nevertheless claims that, because she received inadequate reunification services, the order terminating her parental rights should be reversed and that Lauren should be placed with Fanny in Florida.[3] We disagree.

A.
Margaret contends, the Department concedes, and we agree that, because she *589 did not receive notice of her right to file a writ petition challenging the dependency court's termination of reunification services, Margaret may challenge that order on this appeal. (§ 366.26, subd. (I); In re Cathina W. (1998) 68 Cal.App.4th 716, 722, 724, 80 Cal.Rptr.2d 480.)

B.
But we do not agree with Margaret's contention that she received inadequate reunification services.
First, the issue was waived by Margaret's failure to object at the time services were terminated. Indeed, when the dependency court inquired of her attorney whether there was any information that would allow the court to find there was a substantial probability of return at the 12-month date, Margaret's lawyer responded, "Not at this time, Your Honor. I will certainly file [a section] 388 [petition] if that is not the case." (In re S.B. (2004) 32 Cal.4th 1287, 1293, 13 Cal.Rptr.3d 786, 90 P.3d 746; In re Dakota S. (2000) 85 Cal.App.4th 494, 502, 102 Cal.Rptr.2d 196; In re Lorenzo C. (1997) 54 Cal.App.4th 1330, 1338-1339, 63 Cal.Rptr.2d 562; In re Kevin's. (1996) 41 Cal.App.4th 882, 885-886, 48 Cal.Rptr.2d 763; In re Riva M. (1991) 235 Cal.App.3d 403, 411-112, 286 Cal.Rptr. 592.) No section 388 petition was ever filed.
Second, the argument fails on the merits because substantial evidence supports the dependency court's order. The Department identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with Margaret under the circumstances, and made heroic efforts to assist Margaret in areas where compliance proved difficult. (In re Riva M., supra, 235 Cal.App.3d at p. 414, 286 Cal.Rptr. 592; Armando L. v. Superior Court (1995) 36 Cal.App.4th 549, 554, 42 Cal.Rptr.2d 222.) The problems were obvious Margaret's drug addiction and incarceration and it was the resolution of those problems that proved insurmountable because Margaret was in custody in Florida and the Florida officials did little if anything to (a) assist the Department in its efforts to comply with the ICPC procedures so that Lauren could be placed with Fanny or (b) respond to the Department's inquiries about Margaret's status within the Florida criminal justice system.[4]
Despite these problems, the social worker tracked down Margaret, wrote to her, and spoke to her by telephone, explaining the types of programs she could search for in prison and encouraging her to stay in touch by telephone. Beyond this, there was nothing the Department could do vis-à-vis Margaret. Lauren was too young to talk to her mother by telephone, and (for all practical purposes) actual visits were out of the question. (See § 361.5, subd. (e) [the Department is not obligated to provide reunification services to an incarcerated parent when those services would be detrimental to the child].) And it cannot *590 be disputed that the Department provided reasonable services to Fanny (who may in our view justifiably blame the Florida child welfare officials for the delay, but not the California Department of Children and Family Services). (§ 361.5, subd. (e)(1)(D) [services to an incarcerated parent may include services to extended family m
embers].)
Because Margaret placed herself out of the reach of any meaningful rehabilitative services the Department could have provided, no more was required. (Elijah R. v. Superior Court (1998) 66 Cal.App.4th 965, 970-971, 78 Cal.Rptr.2d 311; and see In re Brittany S. (1993) 17 Cal.App.4th 1399, 1406-1407, 22 Cal.Rptr.2d 50 [criticizing the failure to provide reunification services for a mother "incarcerated in facilities that were less than 40 miles from where" the child lived].)

C.
Margaret contends the dependency court abused its discretion when it refused to place Lauren with Fanny. We disagree.[5]
It is true, as Margaret contends, that family preservation is the first priority when dependency proceedings are commenced. (In re Elizabeth R. (1995) 35 Cal.App.4th 1774, 1787, 42 Cal.Rptr.2d 200.) It is for precisely this reason that the Department did everything within its power to expedite the ICPC process so that Lauren could be placed with Fanny in Florida. ProblemsFanny's reluctance to agree to adoption, the issues about Lauren's present and future medical needs and the attendant concerns about Fanny's willingness to relinquish Lauren's claim to federal funding and, primarily, Florida's frustrating refusal to acknowledge the human element of these proceedings and its bureaucratic adherence to its own time schedulenevertheless arose and time went by. Lauren, now about three years old, bonded with her foster parents. Fanny, notwithstanding her apparent financial security and the dependency court's urging, did not visit and remained a stranger. Under these circumstances, Lauren's best interests have to prevail over all other considerations, and those interests are plainly served only by adoption by her foster parents. (§ 361.3; In re Stephanie M. (1994) 7 Cal.4th 295, 318-319, 27 Cal. Rptr.2d 595, 867 P.2d 706 [even when the preference applies, it does not "overcome the juvenile court's duty to determine the best interest of the child"]; In re Robert L. (1993) 21 Cal.App.4th 1057, 1068, 24 Cal.Rptr.2d 654 [the child's best interest must be the linchpin of the court's analysis]; In re Luke L. (1996) 44 Cal.App.4th 670, 680, 52 Cal.Rptr.2d 53; In re Diamond H. (2000) 82 Cal.App.4th 1127, 1137, 98 Cal.Rptr.2d 715.)[6]
*591 We therefore conclude that the trial court did not abuse its discretion when it refused to place Lauren with Fanny, and trust Margaret understands that severing the family unit the foster parents have created would have devastating consequences to Lauren's best interests. (Crystal R. v. Superior Court (1997) 59 Cal. App.4th 703, 724, 69 Cal.Rptr.2d 414.)

DISPOSITION
The orders are affirmed.
I concur: JACKSON, J.[*]
ROTHSCHILD, J., Dissenting.
I dissent on the ground that the dependency court erred in rejecting placement with Margaret's sister Fanny and terminating Margaret's parental rights. As discussed below, the primary rationale for the majority's decision is that so much time had elapsed since the commencement of the dependency proceeding that, by the time of the dependency court's last hearing, Lauren had bonded with her foster parents and thus would be better off with them than with her natural mother. The majority's approach gives far too much weight to the amount of time that a child resides with a foster parent, gives inadequate weight to facts that warranted placement of Lauren with her aunt's family, and ignores the insidious effect on the child welfare system of using the failure of the system itself as justification for the termination of parental rights.

I
The paramount goal in the initial phase of dependency proceedings is family reunification. (In re Precious J. (1996) 42 Cal. App.4th 1463, 1472, 50 Cal.Rptr.2d 385 ["`Family preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced. [Citation.] ...'"].) The Legislature has defined the child's best interest as reunification throughout that phase unless the dependency court finds that reunification would be detrimental to the child. (In re Elizabeth R. (1995) 35 Cal.App.4th 1774, 1787, 42 Cal.Rptr.2d 200; In re Precious J., supra, 42 Cal.App.4th at p. 1472, 50 Cal.Rptr.2d 385.) Absent a finding of detriment, even incarcerated parents are entitled to reasonable reunification services, whatever the likelihood of success. (In re Brittany S. (1993) 17 Cal.App.4th 1399, 1406-1407, 22 Cal.Rptr.2d 50 (Brittany S.) ["`The effort must be made to provide suitable services, in spite of the difficulties of doing so or the prospects of success.'"]; see also In re Precious J., supra, 42 Cal. App.4th at p. 1472, 50 Cal.Rptr.2d 385.) Visitation is a critical component, probably the most critical component, of a reunification plan. (In re Luke L. (1996) 44 Cal. App.4th 670, 679, 52 Cal.Rptr.2d 53; see also In re Monica C. (1995) 31 Cal.App.4th 296, 308-310, 36 Cal.Rptr.2d 910.) The relative placement preference, another part of the initial phase of dependency proceedings, is designed to facilitate reunification and visitation by placing a child with caregivers who will favor the goals of reunification and visitation and will be less likely than other foster parents to compete with the biological parents for custody of the child. (Welf. & Inst.Code, § 361.3[1]; Cesar v. v. Superior Court (2001) 91 Cal. App.4th 1023, 1031-1032, 111 Cal.Rptr.2d 243; see also In re Sarah S. (1996) 43 Cal.App.4th 274, 284-286, 50 Cal.Rptr.2d 503 [§ 361.3 "places the relative at the *592 head of the line when the court is determining which placement is in the child's best interests[.]"].) Only "[a]fter the termination of reunification services [does] the parents' interest in the care, custody and companionship of the child" cease to be paramount. (In re Stephanie M. (1994) 7 Cal.4th 295, 317, 27 Cal.Rptr.2d 595, 867 P.2d 706; see also In re Elizabeth R. (1995) 35 Cal.App.4th 1774, 1788, 42 Cal. Rptr.2d 200; Andrea L. v. Superior Court (1998) 64 Cal.App.4th 1377, 1386, 75 Cal. Rptr.2d 851.) All of these considerations favor Margaret's position.

II
The majority offers several reasons for its decision affirming the denial of placement with Fanny and termination of Margaret's parental rights, but its primary rationale is that so much time has passed that it is in Lauren's best interest to remain permanently with her foster parents and to terminate Margaret's parental rights. I address this rationale below. None of the other reasons offered by the majority as a basis for rejecting placement with Margaret's sister's family and terminating parental rights warrants the result the majority favors.
The majority's reliance on the opinion of the Department of Children and Family Services (DCFS) that Fanny herself was not a preferable alternative to the California couple is not justified by the governing law or the facts in this case. The law of California clearly and indisputably prefers initial placement with a relative over placement with non-relatives. Section 361.3 "command[s] that relatives be assessed and considered favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child" during the reunification phase of dependency proceedings. (In re Stephanie M., supra, 7 Cal.4th at p. 320, 27 Cal.Rptr.2d 595, 867 P.2d 706, italics omitted.)
The record demonstrates that (i) Margaret wished to have Lauren placed with Fanny and her family; (ii) Fanny and her husband were approved by the Florida welfare agency as licensed caregivers; (iii) Fanny wanted Lauren placed with her and was ready to adopt her or accept other permanent placement; and (iv) placement with Fanny would facilitate visitation by Lauren with her mother. On this last point, the majority is correct that telephone and face-to-face visitation were impossible because of Lauren's age and because her foster parents resided in Los Angeles. These facts argue, however, for the very solution that Margaret and her sister Fanny were advocating: the placement of Lauren with Fanny in Florida where she could visit and bond with her mother.
The majority also doubts Fanny's suitability on the ground that, she did not exhibit sufficient enthusiasm for adoption. (Maj. Opn. ante, at pp. 585, 586, 590.) In my opinion, the record does not justify this doubt. In a letter dated April 23, 2006, Fanny wrote to DCFS, "[W]e ask that we still be considered to care for Lauren, either for adoption or long-term relative care[.]" She further noted, "We are greatly concerned that due to all the delays ... Lauren will not be placed with her family. My husband and I have worked diligently to follow all requests and the delays between the two states do not reflect our efforts." Further, an August 8, 2006 DCFS report confirms that "[Fanny] has stated clearly that she and her husband wish to have Lauren placed in their care and that [they] will adopt Lauren if Mother cannot reunify and Parental Rights are eventually terminated." As discussed above, one of the reasons that placement with a relative is preferred over placement *593 with a non-relative is that relative placement is less likely to lead to conflict with the caregiver when the natural parent is able to resume her parental responsibilities. All that should have been required of Fanny is that she and her husband wanted to have Lauren placed with them, that they were suitable foster parents, and, in the event reunification with Margaret proved impossible, that she wanted to adopt Lauren. The record establishes each of these factors.
DFCS cited as an additional ground for denying placement with Fanny and her family that the Florida child welfare system was not up to the job of monitoring Lauren's placement with them. Although as Californians, we are confident that we do things better here than anywhere else, we doubt the citizens of Florida would share that view. Moreover, the very nature of the Interstate Compact on the Placement of Children (ICPC) placement process requires child welfare agencies to rely upon their counterparts in other states. It was the job of Floridians, not Californians, to conduct a relative placement home study of Fanny's home, and the proper role of DCFS was to respect the Florida officials' favorable determination on that issue.
Among the other factors that apparently persuaded the majority to affirm the termination of Margaret's parental rights is that Margaret is less than an ideal mother. The majority cites her drug addiction and criminal record, both relevant factors, but in themselves not sufficient under our law to deprive her of parental rights. Indeed, it is not the job of the welfare system to pick the better parent but rather, as a primary goal, to achieve reunification with the actual parent. (See In re Kimberly F. (1997) 56 Cal.App.4th 519, 529-530, 65 Cal. Rptr.2d 495.) It is relevant here to note that the dependency court did not find that reunification with Margaret would be detrimental to Lauren. In regard to Margaret's incarceration, the comment of the court in Brittany S. is apposite: "While `use a gun, go to prison' may well be an appropriate legal maxim, `go to prison, lose your child' is not." (Brittany S., supra, 17 Cal.App.4th at p. 1402, 22 Cal.Rptr.2d 50.)
As noted above, however, the real ground for the majority's decision is that so much time had elapsed since the commencement of the dependency proceeding that Lauren had bonded with her foster parents and therefore is better off with them than with her aunt or her natural mother. I do not agree. This approach gives far too much weight to the amount of time that a child resides with a foster parent. As the court in In re Kimberly F. observed, although a child's bond to foster parents is an important consideration in dependency proceedings, it "cannot be dispositive ... lest it create its own self-fulfilling prophecy." (In re Kimberly F., supra, 56 Cal.App.4th at p. 531, 65 Cal. Rptr.2d 495.) The court's observation is particularly appropriate in this case because the delays that enabled the bonding and stability that so impress the majority occurred as a direct result of the failure of the California and Florida child welfare agencies to manage the reunification process in the manner required by the special. circumstances of this case.[2]
*594 Moreover, the focus on stability and permanence becomes paramount only after reasonable reunification services have been extended and terminated. (See In re Stephanie M., supra, 7 Cal.4th at p. 317, 27 Cal.Rptr.2d 595, 867 P.2d 706.) In this case, because of the delays noted in the majority's decision, DCFS's refusal to recognize that Fanny's family provided the legally preferable placement for Lauren, and DCFS's failure to provide Margaret with assistance within the Florida prison system that would contribute to the possibility of reunification, the child welfare system itself created the facts which it then used to justify the termination of parental rights. In a situation like this, in which a parent failed to receive reasonable reunification services during the reunification period, reunification services should be extended beyond the normal statutory deadlines. (See § 352; Brittany S., supra, 17 Cal.App.4th at pp. 1406-1408, 22 Cal.Rptr.2d 50; In re Elizabeth R., supra, 35 Cal.App.4th at pp. 1797-1799, 42 Cal. Rptr.2d 200; Mark N. v. Superior Court (1998) 60 Cal.App.4th 996, 1015-1019, 70 Cal.Rptr.2d 603; In re Monica C, supra, 31 Cal.App.4th at pp. 306-311, 36 Cal. Rptr.2d 910; In re Dino E. (1992) 6 Cal. App.4th 1768, 1778-1780, 8 Cal.Rptr.2d 416.)

III
In concluding that DCFS provided reunification services to Margaret that were reasonable under the circumstances, the majority agrees with DCFS's argument that "Margaret placed herself out of the reach of any meaningful rehabilitative services that [DCFS] could have provided," like the father in Elijah R. v. Superior Court (1998) 66 Cal.App.4th 965, 970-971, 78 Cal.Rptr.2d 311. (Maj. Opn. ante, at pp. 589-90.) To the extent the majority's statement implies that simply by being incarcerated, Margaret lost her entitlement to any reunification services, it is contrary to the holding in Brittany S., supra, 17 Cal.App.4th 1399, 22 Cal.Rptr.2d 50. Nor does Elijah R. so hold. In Elijah R., a father with a criminal record reoffended and was incarcerated in Nevada after dependency proceedings involving his daughter commenced. Further, for the seven months prior to his incarceration he had failed to take advantage of the reunification or visitation opportunities DCFS provided. (Elijah R. v. Superior Court, supra, 66 Cal.App.4th at pp. 967-971, 78 Cal.Rptr.2d 311.) Margaret did not reoffend and did not fail to take advantage of reunification services. Indeed, although no services were provided to her, on her own she sought out and participated in available prison programs.[3]
Rather, Margaret's situation is like that of the mother in Brittany S., In Brittany S., as in this case, the incarcerated mother cooperated to the best of her ability in the reunification process. (Brittany S., supra, 17 Cal.App.4th at pp. 1403, 1407, 22 Cal.Rptr.2d 50.) In Brittany S., as in this case, the welfare agency failed to manage the case effectively and efficiently, thereby causing the delay that it then used to justify the termination of parental rights. (Id. at pp. 1402-1404, 1407, 22 *595 Cal.Rptr.2d 50.) In Brittany S., as in this case, visitation was the key ingredient that was missing, because the absence of visitation "virtually assure[s] the erosion (and termination) of any meaningful relationship" between a dependent child and her parent, but the agency failed to take advantage of available opportunities to facilitate visitation, as DCFS did in this case by not placing Lauren with Fanny. (Id. at p. 1407, 22 Cal.Rptr.2d 50.) fn Brittany S. the appellate court concluded, as we should in this ease, that the dependency court erred in terminating parental rights. (Id. at p. 1407, 22 Cal.Rptr.2d 50.)
In re Monica C, supra, 31 Cal.App.4th 296, 36 Cal.Rptr.2d 910, is also instructive. In Monica C, the child welfare agency provided minimal reunification or visitation services to a mother who was sentenced to prison for more than eight years for a parole violation after the dependency proceeding regarding her infant daughter began. (Id. at pp. 299-303, 36 Cal.Rptr.2d 910.) The agency argued that visitation and other reunification services could serve no useful purpose if a parent is incarcerated longer than 18 months, necessarily beyond the statutory deadline for reunification. (Id, at p. 308, 36 Cal. Rptr.2d 910.) The court rejected this argument, noting that the reunification process is designed to help parents build and maintain a relationship with their children even in cases in which the parents ultimately are not able to reunify, such as through the mechanisms of guardianships or relative placements. (Id at pp. 308-310, 36 Cal.Rptr.2d 910.) The court reasoned, "The purpose of dependency proceedings, and in particular of reunification services, is to `safeguard parent's rights to raise their own children whenever this can be done without prejudice to the welfare of the child.' [Citations.] ... [I]f reunification services are to serve the statutory purpose of safeguarding parental interests, they should also consider the possible merit of intermediate solutions [between full reunification and adoption] which preserve some contact between parent and child." (Id. at pp. 309-310, 36 Cal.Rptr.2d 910.) Like the agency in Monica C, DCFS here failed to provide services that would have allowed Margaret to secure an intermediate solution even if full reunification was impossible. The appellate court in Monica C. required the agency to provide additional reunification services to give the mother the fair chance she earlier had been denied. We should do the same.

IV
The majority concludes that Margaret has forfeited her right to raise the issue of reasonable reunification services on appeal, citing the decision by our Supreme Court in In re S.B. (2004) 32 Cal.4th 1287, 13 Cal.Rptr.3d 786, 90 P.3d 746, superseded by statute on a different point as stated in In re M.R. (2005) 132 Cal.App.4th 269, 273-274, 33 Cal.Rptr.3d 629. The Court in In re S.B. stated that "application of the forfeiture rule is not automatic[,]" but that a reviewing court may excuse forfeiture in a case that presents an important legal issue. (32 Cal.4th, supra, at p. 1293, 13 Cal.Rptr.3d 786, 90 P.3d 746.) I find that this is such a case because it raises important legal issuesincluding whether the state may terminate a parent's rights as a result of the state's own failure to fulfill its responsibilities under the applicable child welfare laws.

V
The judgment terminating Margaret's parental rights should be reversed, Margaret should have additional reunification services, and Lauren should be placed with Fanny and her family forthwith pursuant to the relative placement preference expressed in section 361.3.
NOTES
[1] Undesignated section references are to the Welfare and Institutions Code.
[2] Although we refer to the issues as "Margaret's contentions," the fact is that she advised us that, pursuant to In re Sade C. (1996) 13 Cal.4th 952, 55 Cal.Rptr.2d 771, 920 P.2d 716, she was unable to file an opening brief on the merits. Our independent review of the record confirms that counsel was correct, but our dissenting colleague requested briefing on the issues discussed in this opinion-and it was in response to that request that Margaret's arguments were presented. In short, Margaret's lawyer recognized the futility of an appeal in this case.
[3] At oral argument and in a post-argument letter brief, Margaret's lawyer told us we should not "speculate that Fanny no longer wanted to receive placement of Lauren or adopt her solely based on her participation" in the contract she entered with Lauren's foster parents. She also told us that, "recognizing that time has passed and Lauren is bonded to her [foster parents] who have provided excellent care for her, as an alternative second choice, [Margaret] would request that her parental rights not be terminated and that guardianship be entered into as Lauren's permanent plan rather than adoption by the [foster parents]."
[4] The social worker called the Florida Department of Corrections, the St. Johns County Sheriff's office, the St. Johns jail, the St. Johns felony court, the St. Johns public defender's office, and the St. Johns district attorney's office, and the most she was able to obtain was an address for Margaret. Although Margaret must have had a lawyer representing her in the Florida criminal proceedings, that lawyer never contacted the Department. As a result, it was impossible for Lauren's social worker to find out whether there were suitable programs available for Margaret within the Florida penal system. Given these facts, we do not understand what it is that our dissenting colleague believes the Department could have done.
[5] The Department contends that, because Fanny has not appealed, Margaret has no standing to challenge the trial court's rejection of her request for relative placement. (See Cesar V. v. Superior Court (2001) 91 Cal.App.4th 1023, 1035, 111 Cal.Rptr.2d 243; Clifford S. v. Superior Court (1995) 38 Cal. App.4th 747, 751, 45 Cal.Rptr.2d 333.) Whatever the merits of this argument in the abstract (and in light of Fanny's agreement with the foster parents), we address the issue as part of Margaret's challenge to the orders ultimately resulting in the termination of her parental rights.
[6] We know of no way that the Department or the dependency court could have transferred Lauren to Fanny before the licensing process was completed, and Margaret does not suggest how that could have been done. (Fam. Code, § 7901, art. 3, subd. (a) ["No sending agency shall send ... into another party state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in [the ICPC] and with the applicable laws of the receiving state governing the placement of the children therein"], emphasis added.)
[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] All further statutory references are to the Welfare and Institutions Code.
[2] The majority is too generous in its characterization of the performance of the welfare agencies. Rather than refusing merely "to expedite the process," both agencies mishandled the case, causing the unnecessary prolongation of the process. Although this case proved, from an early date, to be difficult, thus possibly requiring higher-level attention to get the job done, DCFS provided little, if any, such attention. Moreover, during the crucial first six months of the proceeding DCFS lost track of the case for almost three months, and the Florida agency's management of the case evidenced an unfortunate propensity for bureaucratic obstructionism.
[3] The majority implies that both Margaret and her attorney were equivocal about placing Lauren with Margaret's sister in Florida. In her briefs and during oral argument, however, Margaret's lawyer stated that Margaret's first choice was placement of Lauren with Margaret's sister, Fanny. After the hearing, in a letter to this court, Margaret's lawyer confirmed this position. Moreover, in a letter to this court, Margaret herself specifically requested that Lauren be placed with Fanny.