Filed 12/21/15  In re S.C. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re S.C., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D068598 |
| Plaintiff and Respondent, | (Super. Ct. No. J519200) |
| v. | |
| K.C., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald L. Johnson, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Emily K. Harlan, Senior Deputy County Counsel, for Plaintiff and Respondent.

K.C. (Mother) appeals from the juvenile court's judgment declaring her minor daughter, S.C., a dependent and placing her with the maternal grandparents out-of-state, contending the court abused its discretion because the placement impeded reunification. The San Diego County Health and Human Services Agency (Agency) maintains the juvenile court did not abuse its discretion, given the circumstances of the case and the relative placement factors under Welfare and Institutions Code section 361.3.[1] We agree and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

S.C. was born in New Jersey in December 2004 to Mother and her husband A.C. A.C. died in an automobile accident in 2006. The Agency opened S.C.'s dependency case when she was 10 years old, following an incident during which Escondido, California police found Mother and S.C. walking along a road, with S.C. covered in a bed sheet. S.C told the police they had traveled to California from Chicago for a festival one week prior. She reported, among other things, that she had only showered one time all

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise noted.

Mother also appealed "7/30/15 - all orders," but asserts no claim of error as to any other order. Accordingly, we deem that portion of her appeal abandoned. (*In re Sade C.* (1996) 13 Cal.4th 952, 994.) S.C. filed a letter brief with this court indicating she joins in the Agency's arguments. S.C.'s father is deceased.

2

week, ate once per day and had no place to sleep. She also said Mother believed she was Mother Nature. The police determined Mother could not formulate a plan for her and S.C.'s care, and they placed Mother on a section 5150 hold, pursuant to which she was admitted to the hospital.[2] S.C. was detained at Polinsky Children's Center (Polinsky). The Agency filed a juvenile dependency petition on S.C.'s behalf, on the grounds Mother could not provide regular care for S.C. due to her mental illness.[3]

Social worker Shari Tharp prepared the detention report. S.C. grew up in New Jersey. She recalled living with her grandparents when she was seven years old because her " 'mom was acting funny' " and " 'doing the same things she's doing now.' " She expressed a desire to return to Chicago, where she had her bed and clothes, but also said she did not want to return to Mother's care. In a follow-up telephone conversation, S.C. told Tharp she did not want to attend the detention hearing, but wanted the judge to know she wanted to live with her aunt and did not want to go back with Mother. She then called back and said she did want to go to court because she was concerned Mother would lie and wanted the judge to understand she did not want to return to Mother's care.

When Tharp asked Mother about her about family, in connection with safety planning, she said they were not allowed near S.C. She indicated she had two sisters and

---

[2]    Section 5150 permits peace officers and specified mental health professionals to take a person into custody if there is probable cause to believe the person is a danger to herself or others. (*City of San Diego v. Kevin B.* (2004) 118 Cal.App.4th 933, 936; § 5150, subd. (a).)

[3]    The Agency initially brought a second count based on S.C. being without support due to Mother's hospitalization. This count was dismissed.

did not get along with them. She claimed her father was controlling and hit her for discipline and said she spoke with a social worker as a minor, but " 'guess[es] [she] didn't give them enough information.' " Mother would not answer all of Tharp's questions about her childhood and Tharp found her evasive. Mother wanted to move to San Diego because everybody was healthy and it was a better environment. She also realized she needed to start over again and told Tharp " 'something is not right' " and " 'something was dark.' " When Tharp asked why she did not return to Chicago to pack, she indicated her ex-boyfriend robbed her house, killed or hurt her cat and took her dog to a shelter, which she knew because she prayed and got answers. She stated she refused to return to Chicago.

The maternal grandparents told Tharp they cared for S.C. for seven of her 10 years. They first obtained a guardianship through New Jersey family court when S.C. was approximately two years old and relinquished it when Mother was in a better position to care for S.C.[4] They also had custody of S.C. when she was removed from Mother's care at age five and during the dependency case that followed.[5] Mother was able to reunify approximately two years later. One year after that, Mother left New Jersey with S.C. and ended contact with the family. The maternal grandparents obtained

---

[4] S.C.'s New Jersey child welfare history reflects Mother recovered custody "with the support of the [maternal grandparents] after receiving services for her issues at that time." The history was attached to the addendum report, discussed *post*.

[5] The record suggests the remaining portion of the seven years encompassed times when Mother (and her husband, for a period of time after S.C.'s birth) also lived with them.

a family court visitation order, but were unable to visit because Mother had left the state and refused to communicate. They were willing to care for S.C. and were concerned about her safety and well-being. Tharp also spoke with one of the two maternal aunts, who indicated she and her parents were available to care for S.C. and that her sister also was interested in helping.[6]

At the detention hearing on June 3, Mother made a request that S.C. be detained with her pending trial, to which S.C.'s counsel objected. County counsel asked if the Agency could begin an Interstate Compact on the Placement of Children (ICPC) process for the maternal grandparents and a maternal aunt. The court ordered S.C. detained at Polinsky (or other placements upon notice) and directed the Agency to evaluate relatives for placement and support. The court also ordered liberal, supervised visitation. The Agency noted S.C. did not wish to visit Mother at this time, but would do its best to encourage visits.[7]

In the jurisdiction/disposition report, the Agency recommended placement in a licensed foster home and continuing supervised visitation. Mother's proposed case plan

---

[6]     The maternal grandparents also reported a child welfare referral for Mother herself, involving a situation where she bruised her thigh on a bedpost, but told a classmate her father hit her. Social workers investigated and Mother admitted the bruise was from the bedpost. The maternal grandfather denied physical abuse of Mother. The maternal aunt with whom Tharp spoke acknowledged physical discipline was used in the household, but also denied abuse and stated they were a "loving, happy family."

[7]     The juvenile court also found temporary jurisdiction at the detention hearing, pending an inquiry under the Uniform Child Custody Jurisdiction and Enforcement Act to determine whether Illinois wished to take jurisdiction. At a subsequent hearing, the juvenile court noted the Illinois court had declined jurisdiction and confirmed that it had jurisdiction.

included counseling, a psychiatric/psychological evaluation, parenting education, dual diagnosis substance abuse treatment, substance abuse testing and supervised visits. The report also provided additional information on Mother's whereabouts and visitation efforts, as well as S.C.'s wishes.

On June 10, Mother advised Tharp she still planned to move to San Diego, but was trying to decide if she would return to Chicago to make preparations or stay in San Diego longer and try to locate housing. On June 17, Mother told Tharp by telephone that she had returned to Chicago. She still wanted to move to San Diego, but thought it was more logical and a better financial plan to pack and secure housing before returning. She also wanted S.C. to return to Chicago until they could move to California. Tharp asked why she had not returned initially, so she could pack and S.C. could finish the school year. Mother said she had not felt safe, because she thought her boyfriend was in her home. When Tharp asked why she had not asked for police assistance, Mother said she had lost her phone, ran out of money and had a bad couple of days.

Mother made repeated efforts throughout June 2015 to communicate with S.C., but S.C. refused to see or speak with her. At one point, Mother wrote a letter and attempted to leave it with clothing and other items; S.C. refused to take them, but agreed to let Tharp read parts of the letter over the telephone.

S.C. told Tharp she wanted to tell the judge about how Mother treated her and reiterated she did not want to live with her again. S.C. also wrote a letter to the judge, stating she did not feel safe with Mother, did feel safe with her grandparents, and that Mother had abused her and she wanted to share some stories about what Mother had

6

done. A maternal aunt had visited over a weekend and S.C. was excited and happy to be visiting with her extended family. Tharp also reached S.C.'s paternal grandparents in New York; they were available to care for S.C. if needed, and if not, were interested in being involved as grandparents.

The juvenile court held the initial jurisdictional and disposition hearing on June 23. S.C.'s counsel stated she still wanted to live with her maternal grandparents. Mother's counsel requested ICPC reviews for Illinois, explaining she lived in Illinois, needed a backup plan to permit visits if they were unsuccessful at trial and intended to stay if they could get an ICPC. Her counsel stated if they could not get the ICPC, she would "have no choice but to move back to California if she wants to reunify . . . , since she needs to visit on a regular basis." The court deferred the Illinois ICPC request; confirmed its prior order for liberal, supervised visits; and noted the Agency's duty of good faith and diligence to carry it out.

The Agency's addendum report recommended S.C. be placed with the maternal grandparents upon receipt of an approved ICPC and provided further information on Mother's services and plans. On July 9, Tharp provided her with service referrals in Chicago and San Diego, and referrals for housing, food and other resources in San Diego. On July 16, Mother told Tharp she still wished to move to San Diego, but would stay in Chicago if she could not find a place soon. She explained she was getting a driver's license in Chicago, just became familiar with the city, and was thinking it might be best to stay for reunification and possibly relocate later to San Diego. She did not want S.C.

7

placed with relatives in New Jersey or New York because, if and when S.C. decided to be in contact with her again, distance would make it difficult.

A New Jersey social worker informed Tharp she approved the ICPC placement for the maternal grandparents, found they "historically cared for this child for a good portion of her life," and believed it would be in S.C.'s best interest to return to that stable environment. The ICPC report provided information on their living situation and resources, other adults in the home and their ability to parent. They lived in a residential neighborhood in a four-bedroom house in which S.C. could have her own room. The home presented no safety concerns. The grandparents had two vehicles in good operating condition. They were retired, but receiving monthly pensions, doing well financially and able to support a child. The maternal great-grandmother and a maternal great-uncle also lived in the home. None of the adults had a history of criminal arrests or child abuse or neglect. The report found the maternal grandparents had "good parenting skills," an "excellent familial and friend support system," and "realistic expectations in regards to the Division's goals," while also being willing to provide permanent care if needed.[8] It concluded they were "exceptionally competent to provide a safe, structured, and nurturing home environment" to S.C.

The court held a settlement conference on July 23. Mother's counsel asked the court to order an ICPC for a foster home in Chicago and to reinforce visitation was not

---

[8]     A 2010 report in connection with S.C.'s prior dependency proceeding, attached to the ICPC report, likewise found the maternal grandparents "underst[ood] and agree[d] with the . . . case goal of 'family reunification.' "

optional. County counsel indicated it was not opposing an Illinois ICPC, but it did not make sense until they knew where Mother would be. Later in the hearing, Mother's counsel described the Chicago foster home as a backup and said Mother's plan was to return to San Diego within the week and stay through reunification. With respect to visitation, County counsel noted Mother chose to leave San Diego, but the Agency would continue to facilitate telephone contact and encourage Mother to write letters, stating it is considered part of visitation. County counsel requested detention with the maternal grandparents until the disposition hearing and noted they would be willing to stay in a hotel in San Diego. Mother's counsel opposed detention in New Jersey, but submitted on detention with the grandparents in San Diego.

The court again deferred the Illinois ICPC request, observing "Mother may not be there more than a week anyhow." It provided the Agency discretion to detain S.C. with a suitable relative upon arrival in San Diego. It also reaffirmed its order for supervised visitation and ordered telephonic visitation no more than once per day, if in-person visits were not possible. The court encouraged S.C. to meet with Mother prior to the trial and for Mother to send her a letter or two in the interim.

On July 30, the court held the contested adjudication and disposition proceeding and accepted the Agency reports and ICPC evaluation into evidence. Mother and Tharp testified. Mother was living in Chicago, but planned to move to San Diego to be reunified with S.C. She had taken many steps toward relocating, including visiting several apartments (one of which she did not get due to a low credit rating), looking online for them and having a yard sale in Chicago to help her downsize for the move.

9

Mother's plan after finding an apartment was to get into therapy, parenting classes, a dual diagnosis program and anything that would help her. She was willing to start services once she was set up in San Diego, which she could not do for financial reasons until August 15.

Mother acknowledged she had neither moved to San Diego, nor started services. She was aware S.C. told others she wanted to live with the maternal grandparents and testified S.C. had no friends or family in San Diego, but she wanted S.C. to stay in San Diego so she could visit. Mother explained: "I'm not moving back to New Jersey, so I don't see that happening . . . , [h]er and I reuniting, if she goes to New Jersey." In response to County counsel's inquiry whether she could take the same steps to find a New Jersey apartment that she had for San Diego, Mother stated, "I refuse to do that, no." She elaborated: "If this has anything to do with my . . . mental health, going back to New Jersey is not going to help. It will make things way worse . . . . I get very depressed there. And I would definitely need medication staying there. I don't, technically, need medication. . . . If I was there, I would be a basket case. I would be a mess." She agreed if a doctor ordered her to take medication and it meant getting S.C. back, she would do so.

Social worker Tharp testified Mother had in-person visits, but they stopped when S.C. began refusing to see her. She acknowledged Mother kept trying to visit and call. Tharp had asked Mother to write letters as an alternative to in-person visits, noting S.C. had been open to her sharing Mother's letter, and placed no limit on the number. Mother

10

wrote one or two. Tharp did not consider this a failure to visit, but was concerned about why Mother had not pursued that avenue further.

The juvenile court declared S.C. a dependent and removed her from Mother's custody. It ordered her placed in the approved home of a relative and authorized placement with the maternal grandparents. It found the placement appropriate, noting S.C.'s "lifetime relationship" with them and their ability to "offer [her] a solid[,] . . . safe[,] and appropriate facility in which to live while the mother is offering hope that she might be able to find some kind of housing in San Diego at some point in time." The court also ordered services for Mother consistent with her case plan and reasonable supervised visitation. Mother appealed.

II

DISCUSSION

*The Juvenile Court Did Not Err in Placing S.C. with the Maternal Grandparents*

The sole issue presented in Mother's appeal is whether the juvenile court erred in placing S.C. with her maternal grandparents in New Jersey.

A.    *Applicable Law*

When the juvenile court orders removal under section 361, it places the "care, custody, control, and conduct of the child . . . under the supervision of the social worker." (§ 361.2, subd. (e).) "The social worker may place the child in several locations, including the approved home of a relative. (§ 361.2, subd. (e)(1)-(8).) Relatives who request placement are given preferential consideration. (§ 361.3, subd. (a).) In

11

determining whether to place the child with the requesting relative, the court and social worker consider the factors enumerated in section 361.3, subdivision (a)." (*In re Alicia B.* (2004) 116 Cal.App.4th 856, 862 (*Alicia B.*).)

Those factors are: "(1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs.  [¶]  (2) The wishes of the parent, the relative, and child, if appropriate.  [¶]  (3) The provisions of Part 6 (commencing with Section 7950) of Division 12 of the Family Code regarding relative placement.  [¶]  (4) Placement of siblings and half siblings in the same home, unless that placement is found to be contrary to the safety and well-being of any of the siblings, as provided in Section 16002.  [¶]  (5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect.  [¶]  (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for . . . the child . . . .  [¶]  (7) The ability of the relative to do the following:  [¶]  (A) Provide a safe, secure, and stable environment for the child.  [¶]  (B) Exercise proper and effective care and control of the child.  [¶] (C) Provide a home and the necessities of life for the child.  [¶]  (D) Protect the child from his or her parents.  [¶]  (E) Facilitate court-ordered reunification efforts with the parents.  [¶]  (F) Facilitate visitation with the child's other relatives.  [¶]  (G) Facilitate implementation of all elements of the case plan.  [¶]  (H) Provide legal permanence for the child if reunification fails.  [¶]  . . .  [¶]  (I) Arrange for appropriate and safe child care, as necessary.  [¶]  (8) The safety of the relative's home. . . ."  (§ 361.3, subd. (a).)

12

"However, the 'best interests of the child' is the linchpin of the analysis." (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1068 (*Robert L.*); *Alicia B.*, *supra*, 116 Cal.App.4th at p. 862 [accord].)  The "fundamental duty of the juvenile court is to 'assure the best interest of the child.' " (*Alicia B.*, at p. 864, quoting *In re Stephanie M.* (1994) 7 Cal.4th 295, 321.)

"We review a juvenile court's custody placement orders under the abuse of discretion standard of review; the court is given wide discretion and its determination will not be disturbed absent a manifest showing of abuse." (*Alicia B.*, *supra*, 116 Cal.App.4th at p. 863.)  "Broad deference must be shown to the trial judge.  The reviewing court should interfere only ' "if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did." ' " (*Robert L.*, *supra*, 21 Cal.App.4th at p. 1067.)

B.    *The Juvenile Court Did Not Abuse Its Discretion in Placing S.C. with Her Maternal Grandparents*

We find the placement was within the juvenile court's discretion.  By prioritizing S.C.'s history with her maternal grandparents and their ability to provide a safe and appropriate home, over Mother's desire to live in San Diego (or, at least, outside of New Jersey), the court focused on S.C.'s best interest, as appropriate.  (§ 361.3, subd. (a)(1); *Robert L.*, *supra*, 21 Cal.App.4th at p. 1068.)  Its findings expressly touched on multiple section 361.3 factors, including the nature and duration of S.C.'s relationship with her grandparents, their capacity to offer a stable environment and the safety of their home, and were fully supported by the record.  (§ 361.3, subd. (a)(6), (7)(A) & (8).)

13

The record contained additional evidence to support the court's exercise of discretion within the section 361.3 framework. (§ 361.3, subd. (a).) Although Mother wanted S.C. with her in San Diego, the trial court was entitled to consider the wishes of S.C. and the maternal grandparents for her to be placed with them in New Jersey. (§ 361.3, subd. (a)(2).) The various factors related to protection, care and permanency planning likewise support the placement. The ICPC report confirmed the adults in the house had no history of violence, abuse or neglect. (§ 361.3, subd. (a)(5).) It also made clear the grandparents could exercise proper child control, offer a home and necessities, facilitate visitation with relatives and provide appropriate child care. (§ 361.3, subd. (a)(7)(B), (C), (F) & (I).) The record further reflects they could protect S.C. from Mother if needed and, in the event Mother could not reunify, provide legal permanence. (§361.3, subd. (a)(7)(D) & (H).)

The other relevant factors here pertain to parental proximity and facilitation of reunification and the case plan. (§ 361.3, subd. (a)(3), (7)(E) & (G).) The evidence before the court reflected Mother was unwilling to live in New Jersey, but also that the maternal grandparents recognized reunification was the goal, had supported it in the past and had the financial means to travel. The record also showed Mother had not commenced services, despite receiving referrals. As addressed *post*, we find unpersuasive Mother's position that the placement compromised visitation or reunification. Even if it did, the court would have to balance these concerns with S.C.'s best interest and the remaining section 361.3 factors, which support placement with the

maternal grandparents. Given the placement did not prevent visitation, the court was well within its discretion to place S.C. with them.

Mother maintains the placement was an abuse of discretion, suggesting reunification is the focus of the relative placement assessment and it "effectively nullified" her right to reunification by impeding visitation and conjoint therapy. Her arguments are not persuasive. We begin by addressing those regarding the legal standards.

First, Mother contends a court must consider facilitation of reunification and the case plan, noting just two of the many section 361.3 factors. As discussed *ante*, the court had evidence on these matters and was entitled to find the benefits of the placement outweighed the potential detriment to reunification and the case plan. The only other factor Mother discusses is the child's best interest, which she states is important but not controlling. It is well-settled the child's best interest is the most important factor. (*Robert L.*, *supra*, 21 Cal.App.4th at p. 1068; *Alicia B.*, *supra*, 116 Cal.App.4th at p. 862.) She then contends best interest has been defined as reunification throughout the family preservation phase, relying on *In re Lauren Z.* (2008) 158 Cal.App.4th 1102 (*Lauren Z.*). However, *Lauren Z.* confirms a child's best interest must be considered in light of the circumstances and take precedence over other concerns. (See *id.* at p. 1112 [affirming placement with California foster parents, rather than a maternal aunt in Florida (where the mother was incarcerated), observing the child bonded with her foster parents, while the aunt remained a stranger, and finding that under "these circumstances, Lauren's best

15

interests have to prevail over all other considerations"].)[9]  This attempt to narrow the

section 361.3 analysis to focus primarily on reunification is misguided, as it would render

the other factors meaningless.  " ' "An interpretation that renders statutory language a

nullity is obviously to be avoided." ' "  (*In re J.D.* (2013) 219 Cal.App.4th 1379, 1390.)

In addition, to the extent Mother fails to address the other factors, she impliedly concedes

they support the placement or, at least, do not render it inappropriate.

Next, Mother argues that when reunification remains a possibility, it is an abuse of

discretion to place a minor out-of-state with a relative, relying on *In re Luke L.* (1996) 44

Cal.App.4th 670.  However, *Luke L.* does not hold such a placement is always an abuse

of discretion.  Rather, it found an out-of-state placement with cousins problematic under

the circumstances and is therefore factually distinguishable.  (*Id*. at p. 680.)  There, unlike

here, the cousins were not relatives under section 361.3, the placement divided a sibling

group and it violated the ICPC.  (See *Luke L*., at p. 680.)  The case also did not address

the child's history with the cousins, in contrast to S.C's lifelong relationship with her

grandparents and their significant role in her life.  (See *id*. at pp. 674-678.)  Mother also

notes *Luke L.* found the proposed visitation plan insufficient and observes there is no plan

here; again, however, that finding was fact-specific and, as discussed *post*, there is no

_____

[9]      Mother's citation is to Justice Rothschild's dissent in *Lauren Z.*, *supra*, 158
Cal.App.4th 1102, 1113, without identifying it as such, and, moreover, from its
discussion of the background legal principles at issue.  There is no dispute reunification is
the goal, but the child's best interest remains the central concern.  (*In re Christopher H.*
(1996) 50 Cal.App.4th 1001, 1006 ["At the dispositional hearing, the juvenile court must
order . . . services . . . to facilitate reunification of the family.  [Citations.]  The court has
broad discretion to determine what would best serve and protect the child's interest and to
fashion a dispositional order in accord with this discretion."].)

16

evidence Mother cannot arrange for her own visitation here. (See *id.* at p. 681 [finding the "proposed arrangement . . . an unrealistic one *here*"] (italics added).)

Finally, Mother argues she had a "fundamental liberty interest in the care, custody, and companionship" of S.C. and a right to visit her, and the placement interfered with her constitutional rights. The general principles — her interest in S.C. and right to visit — are not in dispute, but Mother fails to establish the placement interferes with her rights. She relies on *In re Julie M.* (1999) 69 Cal.App.4th 41 and *In re James R.* (2007) 153 Cal.App.4th 413. However, these cases focus on unlawful delegation of authority over visitation and Mother does not allege improper delegation. (*James R.*, at p. 434; see also *Julie M.*, at pp. 43, 48-50.) *Julie M.* is instructive, though, in articulating the relationship between the parent's liberty interest and the child's well-being; it confirms the former cannot be maintained at the expense of the latter, and that "[w]hile visitation is a key element of reunification, the court must focus on the best interests of the children . . . ." (*Julie M.*, at p. 50; see also *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1423 [observing that although a parent's liberty interest " 'may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect' "]; § 362.1, subd. (a)(1)(A) ["Visitation shall be as frequent as possible, *consistent with the well-being of the child*." (Emphasis added.)].)

We turn next to Mother's claim that the placement interferes with her ability to visit and reunify, and determine she has not carried her appellate burden on this issue.

17

First, and critically, Mother admits she can call, write and fly to New Jersey for visits. However, she suggests frequent visits would be difficult due to her limited financial means and that moving back to New Jersey would negatively impact her mental health. This argument minimizes the importance of calling and writing here, especially given S.C.'s willingness to let the social worker share Mother's letter with her. Mother also does not explain how her financial situation would limit visits to New Jersey; she simply notes her monthly income, that she was turned down for an apartment for poor credit and that flights are expensive. She is capable of at least some air travel, as evidenced by the trip to California during which S.C. was detained. As for a move to New Jersey, she cites no evidence besides her own testimony to establish it would affect her mental health.

Second, Mother contends her difficulties with S.C. warrant conjoint counseling and out-of-state placement would impede this. However, conjoint counseling is not in her case plan and she identifies nothing in the record to suggest it would be appropriate in the near future.[10] (*Cf. In re Alvin R.* (2003) 108 Cal.App.4th 962, 965 [reunification plan called for conjoint counseling after minor received eight sessions of individual counseling].) Further, as of the disposition hearing, Mother had not even commenced the therapy that was in her case plan.

Finally, Mother claims her family in New Jersey can do little to facilitate reunification in San Diego; although she acknowledges their prior support, she notes she

_____

[10] Mother does cite to a portion of the social worker's testimony at the contested disposition hearing, but it contains no discussion of conjoint therapy.

no longer lives near them and expresses doubts about their ability to bear travel expenses. As a preliminary matter, we question Mother's assumption that reunification would take place in San Diego. She was still in Chicago as of the contested disposition hearing, had been equivocal about when she would return to San Diego and had not yet secured housing there. In any event, we find her concerns speculative. She provides no evidence to suggest the maternal grandparents would be unable or unwilling to facilitate visits or reunification. To the contrary, the record reflects the maternal grandparents have cared for S.C. when Mother was unable to do so, understand the goal of the process and that Mother successfully reunified with S.C. previously. (See *Robert L.*, *supra*, 21 Cal.App.4th at pp. 1068-1069 [reversing order denying placement with grandparents, finding juvenile court's concern they would obstruct reunification "wholly speculative," where the record lacked evidence of obstruction and instead showed they had been " 'completely cooperative' "].)

We conclude S.C.'s placement with her maternal grandparents was appropriate under section 361.3 and there was no abuse of discretion.

DISPOSITION

The judgment is affirmed.


                                                                  IRION, J.


WE CONCUR:


McDONALD, Acting P. J.


AARON, J.