Filed 6/30/20 Certified for Publication 7/24/20 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| SERENA M., | F080612 |
| Petitioner, | (Super. Ct. No. 18CEJ300170-1) |
| v. | |
| THE SUPERIOR COURT OF FRESNO COUNTY, | **OPINION** |
| Respondent; | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, | |
| Real Party in Interest. | |

## THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  William Terrence, Judge.

Nichole M. Verville and Juvenile Law Center, for Petitioner.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Kevin A. Stimmel, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]     Before Poochigian, Acting P.J., Peña, J. and Snauffer, J.

Petitioner Serena M. (mother), in propria persona, seeks an extraordinary writ from the juvenile court's orders issued at a combined 6-, 12- and 18-month review hearing (Welf. & Inst. Code, §§ 366.21, subds. (e)(1) & (f)(1) & 366.22, subd. (a)(1))[1] on January 16, 2020, terminating her reunification services and setting a section 366.26 hearing as to her now 15-year-old daughter, C.C. Mother contends the juvenile court erred in denying her visitation. We directed mother's trial counsel and real party in interest to file letter briefs addressing the reasonableness of visitation and stayed the section 366.26 hearing then scheduled for April 30, 2020. We grant the petition with instructions and vacate the stay order.

## PROCEDURAL AND FACTUAL SUMMARY

Thirteen-year-old C.C. was removed from mother's custody in June 2018 after she disclosed mother used excessive force in disciplining her. The discipline consisted of hitting her with a belt, pushing her and grabbing her hair. Law enforcement observed that C.C. had a belt mark measuring four inches in length and a half-inch in width on her upper left buttocks. They also observed bruising on her left thigh and a linear six-inch bruise on her lower back. C.C. said she was afraid of mother and mother's boyfriend, Erik R., who she claimed told mother to "beat" her.

Mother had sole legal and physical custody of C.C. Joseph C. (Joseph), C.C.'s father, did not have visitation and had not seen C.C. in two years. The department placed C.C. in the foster home of Teresa M.

C.C. did not feel safe with mother because she " 'beats' " her " 'a lot' " with a belt and hit her legs, arms and back. Mother hit her in the past but it escalated once she became involved with Erik. Three days before, C.C. tried to run away because she was upset. Erik blocked the door and pushed her. He yelled at her and called the police. He and mother lied to the police, saying C.C. hit Erik. When the police left, mother shoved

---

[1] Statutory references are to the Welfare and Institutions Code.

2

C.C.'s face in the bed, grabbed her hair and started punching her head and face and hitting her thigh and back with a belt. Erik bossed mother around and was jealous when C.C. was around her. He threatened the maternal grandparents, saying he was going to beat them. He called C.C. a " 'b****' " and a " 'punk' " when mother was not around. He stared at her " 'weird' " and looked at her butt when she was wearing shorts. He was able to look into her bedroom because mother removed her bedroom door. When C.C. was lying on her bed, he lay down beside her. When she was changing her clothes, he entered her bedroom, saying he was checking on her. C.C. denied that Erik touched her inappropriately. She tried to tell mother what Erik was doing but mother did not believe her, calling her a "liar."

Mother denied knowing how C.C. sustained the bruises but said C.C. was out of control and may have inflicted the bruises herself. C.C. wanted to live with her maternal grandparents because they did not impose rules or discipline her. She denied Erik told her to beat C.C. Erik also claimed C.C.'s injuries were self-inflicted and denied he ever punished her. He said C.C. was possessive of mother and disliked him. He believed the maternal grandparents were manipulating C.C.

The maternal grandfather was concerned about C.C.'s safety in the home. He said Erik bullied and taunted C.C., who was an "A" student and an "overall good child." He had cared for her since she was three years old and wanted placement of her.

The department filed a dependency petition, alleging mother's excessive discipline brought C.C. under the juvenile court's jurisdiction under section 300, subdivisions (a) (serious physical harm) and (b) (failure to protect). The department advised the juvenile court of mother's criminal history, which dated back to 2003 and included arrests and charges for inflicting corporal injury on a spouse and driving under the influence of alcohol. She also had a history of child welfare referrals from 2015 related to general neglect.

3

Joseph also had an extensive criminal history, which included convictions for burglary, force with a deadly weapon, violation of parole, possession of a firearm and driving under the influence of alcohol. He was ordered by the criminal court in April 2014 to complete an 18-month alcohol treatment program but in July 2018 he tested positive for cocaine. He denied knowing how he ingested cocaine. On July 27, 2018, he was arrested for violating his probation. In November 2016, the court issued a five-year restraining order protecting mother from Joseph.

On June 29, 2018, the juvenile court ordered C.C. detained and offered the parents services to address their parenting, mental health and domestic violence needs. C.C.'s attorney informed the court C.C. did not want to visit mother because mother physically harmed her before and she was afraid of her. The court found it would be detrimental for C.C. to visit mother and ordered no visits for them until further order of the court. The court ordered supervised visits for Joseph and set a jurisdictional/dispositional hearing (combined hearing) for July 31, 2018.

By the end of June 2018, C.C. was visiting Joseph weekly under supervision but declined to visit mother. On July 3, mother participated in a domestic violence assessment. It was recommended she complete a 52-week child abuse intervention program (CAIP) and the Phoenix Program for victims of domestic violence.

Mother challenged the department's jurisdictional allegations at the combined hearing on July 31, 2018. The juvenile court set a settlement conference for September 18 and a contested combined hearing for September 25. At the settlement conference, mother's attorney asked the court to grant the department discretion to arrange therapeutic supervised visitation, even just an initial session to see if it was feasible. The social worker stated the department had no objection. Minor's counsel objected, stating C.C. was not interested in reunifying with mother or visiting her. The

4

court granted the department discretion to arrange therapeutic supervised visits and continued the contested combined hearing to October 16.

In its report for the combined hearing, the department advised against returning C.C. to mother's custody or placing her with Joseph, recommending instead the juvenile court provide them family reunification services. The department considered mother's prognosis of reunifying with C.C. uncertain because C.C. did not want to return home.

A different judicial officer presided over the contested combined hearing in October 2018. Mother appeared with her attorney. The department withdrew the section 300, subdivision (a) allegation and mother submitted the matter on the section 300, subdivision (b) allegation. C.C. was also present. The juvenile court upheld the finding visitation would be detrimental but stated:

> "THE COURT: I've never heard [of] such an order. I wonder if I should make it that the Department would—and I don't know if it's relinquishment of judicial authority to give the Department discretion to overcome that finding on ten court days' notice and start visitation. I think to be safe I'll leave [it] in place but I want to look at it very closely and scrutinize it.
>
> "I'll tell [the commissioner who made the finding] I intend to do that [even though] it was his finding. As an independent judicial officer I can make my own findings …."

The juvenile court encouraged C.C. to visit mother and ordered supervised exchange of letters and gifts. The court sustained the section 300, subdivision (b) allegation, ordered C.C. removed from mother's custody and ordered the parents to complete parenting instruction and assessments for mental health and domestic violence services. The court ordered substance abuse services, including random drug testing, for Joseph only. The court ordered a mental health assessment and recommended treatment for C.C.

5

On November 29, 2018, at the post-disposition mediation, social worker Eric Wright, the case manager, informed the juvenile court C.C. refused to visit mother but gladly received her gifts and letters. However, she had not given Wright anything to give to mother. Mother completed a domestic violence assessment and was referred to the CAIP. She was unaware she was referred and had not initiated the service at the time of the mediation. After county counsel sought confirmation there were discretionary orders for therapeutic supervised visits, the court granted the department discretion for family therapy to provide visitation. The court stated it issued that order in another case although it was "meaningless because it does not happen until the therapist says, but if it's in a minute order there is no hang-up or worry that it has to be separately approved …."

In December 2018, C.C. was placed with her maternal grandparents. At a hearing earlier in the month to discuss placement, C.C. stated she did not want to reunify with mother.

On January 17, 2019, social workers met with mother to discuss her failure to initiate her domestic violence services. Mother agreed to participate in the Phoenix Program but not the CAIP, claiming her work schedule prevented it. Despite her refusal, mother participated in two CAIP classes but was dropped from the program on February 21 for missing two consecutive classes.

Meanwhile, on February 5, 2019, mother's attorney filed a modification petition (§ 388) (section 388 petition) requesting therapeutic supervised visitation to facilitate communication and mend her relationship with C.C. According to the petition, mother was fully engaged in services and writing letters to C.C.

On or about February 16, 2019, C.C. was involuntarily detained (§ 5150) by the Kerman police because she was deemed a danger to herself. She was discharged the next day to the care of a hospital for assessment. On February 22, she was discharged and

6

returned to the care of the department with an aftercare safety plan but no medication. On February 26, she was placed in a group home under the care of V.G. She was removed, however, after engaging in a physical altercation with her roommate and placed again with Teresa M.

On February 21, 2019, a third judicial officer conducted the hearing on mother's section 388 petition and presided at all subsequent hearings. County counsel and the attorneys for C.C. and Joseph objected to mother's section 388 petition. C.C.'s attorney argued mother not only physically abused C.C. but also emotionally abused her by not believing Erik harmed her. The court summarily denied the petition, finding there was insufficient evidence to warrant vacating its detriment finding and to find visitation was in C.C.'s best interest. No appeal was taken from the court's denial order.

On March 12, 2019, C.C. told social worker Wright she wanted to visit mother on weekends. That same day, she ran away from foster care.

Joseph was arrested on March 20, 2019 for possession of a controlled substance for sale and a violation of parole. The department filed a section 388 petition on March 26, 2019, asking the juvenile court to terminate his services. He objected and a hearing on the section 388 petition was set to be heard along with the six-month review hearing.

On March 26, 2019, the juvenile court convened the combined hearing on the six-month review and the department's section 388 petition (review/388 hearing). C.C.'s attorney informed the court C.C. was still missing but was adamantly against reunifying with mother. The court continued the hearing because of the lateness of the department's report.

On April 9, 2019, at the continued, review/388 hearing, mother's attorney asked the juvenile court to advance visits to supervised visitation. County counsel verified the department had discretion to arrange therapeutic supervised visitation and family therapy

7

but did not know if the department would progress to supervised visitation without speaking to the social worker.  The court denied the request, given C.C.'s runaway status and the court order for therapeutic supervised visits.  The maternal grandfather explained that C.C. was running away because she was being bullied at school.  The court continued the review/388 hearing to July 16 and set a settlement conference for July 9.

In its report for the review/388 hearing, the department recommended the juvenile court terminate mother and Joseph's reunification services.  Although mother completed a parenting class and did not require mental health and substance abuse services, she had yet to make any progress in her domestic violence services, claiming the classes interfered with her work schedule.  The department tried to facilitate her attendance by offering her services on weekends and evenings.  However, she would only communicate with the department through attorneys.  Given her minimal progress and lack of consistent, positive visitation, the department did not believe it was likely she would reunify.  The department also reported that despite the detriment finding, C.C. contacted mother on her own volition.  Because it did not supervise the contact, the department was unable to assess the consistency of the contact.

On June 13, 2019, mother was told during a meeting that her reunification services would be terminated if she did not participate in domestic violence services.  She agreed to complete a second assessment, which she completed at the Marjaree Mason Center on June 29, 2019.  It was recommended she participate in a safe group.  Social worker Wright inquired about the contradictory results and was told by the substance abuse specialist (SAS), Christina Schwartz, a meeting would have to be conducted to review the inconsistency.

On July 9, 2019, at the settlement conference for the review/388 hearing, the department stated it wanted to proceed to therapeutic supervised visitation and/or family therapy and requested clarification on the court's visitation order.  C.C.'s attorney

8

objected to the court lifting the detriment finding, stating C.C. did not want to visit mother. C.C. told the court during an in-chambers conference that she had no desire to visit with mother in any setting, including therapeutic supervised visitation. She also wanted to be returned to her maternal grandparents' custody. The court confirmed the matter for trial and stated it would address visitation at that time.

On July 16, 2019, county counsel informed the juvenile court C.C.'s therapist reported that morning that it would be detrimental to attempt visitation and asked the court to continue the matter and combine it with the 12-month review hearing. She also informed the court that C.C. refused to return home with her foster parent at the last hearing and ran away. She was placed in a group home. The court found good cause to continue the hearing to August 29, 2019, based on C.C.'s missing status, group home placement and the therapist's comments.

On August 29, 2019, the juvenile court combined the six- and 12-month review hearings with the department's section 388 petition to terminate Joseph's reunification services and set the matter for a trial on November 7, 2019. At the settlement conference on October 31, 2019, county counsel stated C.C. still did not want to visit mother. On November 7, 2019, the department withdrew its section 388 petition. Mother's attorney informed the court C.C.'s therapist did not want to provide any further documentation about visitation. The court combined the 6-, 12- and 18-month review hearings (combined review hearing) and set a hearing date for January 2020. The court ordered the therapist to report as to whether it would be detrimental to have visitation.

In an effort to resolve the very different recommendations from mother's two domestic violence assessments, departmental staff, including the SAS, met with her twice in November 2019. At one meeting, the SAS asked her to drug test and she refused. The meeting was ended early because they had a verbal conflict. After evaluating both assessments and conferring with the clinicians who conducted them, the Marjaree Mason

Center staff recommended mother complete the 52-week CAIP and Phoenix Program. The department notified mother of the recommendations.

The department maintained its recommendation the juvenile court terminate reunification services. It reported mother wrote to C.C. from October 2018 until she was placed with her maternal grandparents, at which point mother ceased writing. She resumed letter writing in March 2019 after C.C. was removed from her grandparents. In February 2019, C.C. was given a cell phone which she used to call mother every night. V.G., her care provider, supervised the telephone calls. Despite their regular contact, C.C. reported she did not want to visit mother. She believed mother chose Erik over her. C.C.'s therapist did not recommend family therapy at that time and deferred to C.C.'s express desire regarding visitation.

On December 12, 2019, the juvenile court confirmed the matter for trial. C.C.'s attorney informed the court that mother had had unsupervised contact with C.C. and asked the court to remind mother there was a standing order against it. The court admonished mother, stating:

> "THE COURT: That is an accurate statement of our case, [mother]. I was provided information that sometimes you and [C.C.] may be having contact by way of text message or [electronic social media]. If that communication is taking place, that is in clear violation of this Court's order, and will be considered at a future time. This court is going to order you again not to have any communication with [C.C.] that's not supervised by the [department], an approved agency or a third party approved by the [department].
>
> "Additionally, the record already includes information from your daughter's mental health professional that at this time your daughter does not wish to meet with you, and, based on that, this Court has not ordered any visits to occur, certainly on [an] unsupervised basis, and any contact you're having with [C.C.] is in violation of a court order."

On January 14, 2020, the juvenile court conducted the contested, combined review hearing. V.G., C.C.'s former care provider, testified she had custody of C.C. for several

10

months in 2019. She could not remember the exact timeframe but estimated it was six months before. She supervised telephone calls between mother and C.C. They were positive. They were laughing and talking. When C.C. was first placed with her, she wanted clothing from home. She took C.C. to meet with mother for the clothing and C.C. was happy to see her mother. They laughed and talked. Mother brought C.C. a sandwich and they interacted like mother and daughter. Mother was also there when C.C. went for therapy sessions and they interacted. Mother called V.G. once or twice a month to check on C.C. and V.G. told her how she was doing. She never spoke to C.C. about whether she wanted to visit mother.

Social worker Wright testified he suggested mother participate in the parent partner program. Mother expressed concern about her ability to participate in the CAIP because it conflicted with her schedule. They attempted to find a new program for her that would meet her schedule but needed a staffing to do that and it took several months to schedule the staffing because of mother's schedule. Mother said she was only available on weekends. He referred her to a program that offered evening sessions. He consulted another program which did not offer weekend sessions. He did not pursue therapeutic supervised visits because of the court's detriment finding and C.C.'s unwillingness to visit. Several times C.C. indicated that she wanted visits but then changed her mind before the next opportunity to visit.

Mother testified Wright asked her to complete services that were not required by her case plan, such as work with a cultural broker and take classes in parenting, trauma and child abuse. These classes caused her to miss a lot of work and jeopardized her job. She attended two child abuse classes and quit after her employer gave her the choice of going to classes or having a job. She asked Wright about attending weekend classes but they were not available. She also asked about evening classes but they were not available either. She asked about therapeutic supervised visits but did not know why they were not

11

approved. She had text conversations with C.C. which C.C. initiated. She completed a second domestic violence inventory and the recommendation was a safe group class. C.C.'s therapist asked to schedule an appointment with her in April, May and December 2019. She did not go because the court previously warned her about having contact with her daughter.

Mother testified she loved C.C. but had not been able to tell her that because of the court's no-contact order. She tried to tell her by letter but the letter was returned because she was not supposed to talk about the proceedings. She ended her relationship with Erik a couple of months after C.C. was removed. Wright did not discuss alternative domestic violence classes with her that would work into her schedule. There were no classes offered that she could complete on weekends or after hours. She denied that social worker Kate Martell told her at a meeting on November 26, 2019, that Marjaree Mason Center had evening classes available for her. She was still employed and could not afford to lose her job or she would be homeless.

Social worker Martell, mother's social worker since August 2019, received the results of mother's domestic violence assessment completed in June 2019. The recommendation was for mother to participate in the safe group at Marjaree Mason Center. Mother was told they offered evening classes. Martell could not remember if they offered weekend classes. She met with mother on November 1 to discuss the contradictory domestic violence recommendations. Mother became agitated and left the meeting before they could come to an agreement. They met again on November 25, 2019, and the recommendation was changed via an email from Marjaree Mason Center. She did not recall C.C.'s therapist commenting on whether it would be detrimental to C.C. to visit mother. She became aware after the fact that the therapist tried to contact mother and discussed with the therapist why that was inappropriate at the time. The

12

therapist was still requesting a one-time session during which C.C. could express her feelings about everything she had experienced for the prior two years.

Mother, recalled to the stand, testified about a picture of her and C.C. taken in her car at C.C.'s school in May or June 2019. Mother was there to attend a meeting to address C.C.'s attendance and school performance. She also testified about a screen shot of text messages from C.C. sent in May 2019. The court received the picture into evidence but not the text messages because there was inadequate foundation and they were not properly authenticated.

C.C. testified she never wanted visits with mother. She saw mother but seeing her did not make her happy. She told mother in a text that she wanted to come home. She loved mother but did not miss her. Asked whether she wanted to visit her, she stated, "Um, just see how it goes." If provided the one-time session with mother and her therapist, she was not sure if she would want to visit afterward. She wrote a letter to mother at mother's request. Mother told her she would give her money if she did. Mother told her to write that she wanted to go home. She did not feel safe living with mother even if mother was not dating anyone and lived by herself. She stated, "I don't feel comfortable no more. It's not my home. [¶] … [¶] I just don't want to go home. I'm not going back."

Mother's attorney argued she was denied reasonable services because she was denied visitation. She was not resistant to completing domestic violence services, as the department argued, but was attempting to complete services suggested by Wright but which were not ordered as part of her case plan.

The juvenile court found it would be detrimental to return C.C. to mother's custody and terminated reunification services. The court specifically addressed mother's violation of its visitation order by initiating text messaging with C.C. and offering her money to write a letter stating she wanted visitation. The court also did not find mother's

13

testimony credible that she would be fired for not complying with the court's orders and that she could only attend the CAIP during work hours. The court found by clear and convincing evidence that mother was provided reasonable reunification services but she elected not to complete her domestic violence classes, CAIP classes and safe group. The court did not believe it delegated visitation to C.C. The court found there was not a substantial probability C.C. could be returned to mother's custody after an additional period of reunification based on mother's testimony and her progress, which the court characterized as "moderate." The court set a section 366.26 hearing for April 30, 2020.

## DISCUSSION

### *Legal Principles*

"We start with the fundamental premise that the underlying purpose of dependency law is to protect the welfare and best interests of the dependent child." (*In re Luke M*. (2003) 107 Cal.App.4th 1412, 1424–1425 (*Luke M*.).) "Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect." (*In re Marilyn H*. (1993) 5 Cal.4th 295, 307.) Thus, the focus is on the child, not the parent. "That is, once dependency jurisdiction is acquired because of the custodial parent's conduct, the court's inquiry shifts to a focus on the child's best interests, albeit with a preference towards parental reunification." (*Luke M*., *supra*, 107 Cal.App.4th at p. 1425.)

"The paramount goal in the initial phase of dependency proceedings is family reunification." (*In re Lauren Z*. (2008) 158 Cal.App.4th 1102, 1113 (dis. opn. of Rothschild, J.).) "The foundation and central, unifying tool in child welfare service is the [reunification] plan. The [reunification] plan must provide for the child's care and case management and must provide services that facilitate both return and, concurrently,

14

permanency." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2020 ed.) Disposition Hearing, § 2.129[4].)

" 'At a disposition hearing, the court may order reunification services to facilitate reunification between parent and child.' [Citation.] Reunification services must be 'designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' [Citation.] Accordingly, a reunification plan must be appropriately based on a particular family's 'unique needs.' " (*In re T.G.* (2010) 188 Cal.App.4th 687, 696.)

"Visitation is a critical component, probably the most critical component, of a reunification plan." (*In re Lauren Z.*, *supra*, 158 Cal.App.4th at pp. 1113–1114.) "Without visitation of some sort, it is virtually impossible for a parent to achieve reunification." (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1491–1492.) "The absence of visitation will not only prejudice a parent's interests at a section 366.26 hearing but may 'virtually assure[ ] the erosion (and termination) of any meaningful relationship' between [parent] and child." (*In re Monica C.* (1995) 31 Cal.App.4th 296, 307.)

To promote reunification, visitation must be as frequent as possible, consistent with the well-being of the child. (§ 362.1, subd. (a)(1)(A).) Visitation requirements exist "[i]n order to maintain ties between the parent … and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent." (*Id.*, subd. (a).)

"While visitation is a key element of reunification, the juvenile court must focus on the best interests of the children 'and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm ….' " (*In re Julie M.* (1999) 69 Cal.App.4th 41, 50.) To that end, subdivision (a)(1)(B) of section 362.1 mandates that "[n]o visitation order shall jeopardize the safety of the child." Thus, "[I]f visitation is not consistent with the well-being of the child, the juvenile court

15

has the discretion to deny such contact…. '[W]ell-being' includes the minor's emotional and physical health.' " (*In re T.M.* (2016) 4 Cal.App.5th 1214, 1219.) In effect, the juvenile court may deny visitation by finding that forced contact with a parent is harmful to the child. (*In re Mark L.* (2001) 94 Cal.App.4th 573, 581.)

It is the juvenile court's responsibility to ensure regular parent-child visitation occurs while at the same time providing for flexibility in response to the changing needs of the child and to dynamic family circumstances. (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1376 ["Visitation arrangements demand flexibility to maintain and improve the ties between a parent or guardian and child while, at the same time, protect the child's well-being."]; *In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1234–1235.) The dependency statutes protect the parent's liberty interest in his or her child by requiring periodic review hearings conducted at six month intervals. (§ 366, subd. (a)(1).) Through the department's reports the juvenile court is informed about the department's compliance with the case plan in making reasonable efforts to return the child to a safe home and the parent's progress in completing his or her case plan and the nature and quality of visitation and contact with the child. The juvenile court is required to determine at each review hearing whether the parent was provided reasonable reunification services. (§§ 366.21, subds. (e)(8) & (f)(1)(A) & 366.22, subd. (a)(3).) A parent may challenge the department's evidence on that issue at the review hearing or on appeal from the juvenile court's findings and orders from the review hearing. The juvenile court may not set a section 366.26 hearing unless it finds by clear and convincing evidence the parent was provided reasonable reunification services. (§ 366.22, subd. (b)(3)(C).)

***Standard of Review***

"When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence. [Citation.] ' "In juvenile cases, as in other areas of

16

the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact." ' [Citation.] Even if there is no substantial conflict in the evidence, we must nevertheless draw all legitimate inferences in support of the findings of the juvenile court." (*In re Alvin R*. (2003) 108 Cal.App.4th 962, 971 (*Alvin R*.).)

"A finding that reasonable reunification services have been provided must be made upon clear and convincing evidence. [Citation.] 'When the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing evidence, the reviewing court must determine if there is any substantial evidence—that is, evidence which is reasonable, credible and of solid value—to support the conclusion of the trier of fact. [Citations.]' " (*Alvin R*., *supra*, 108 Cal.App.4th at p. 971.)

"When applying the substantial evidence test, however, we bear in mind the heightened burden of proof. [Citation.] 'Under this burden of proof, "evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind." [Citation.]' " (*Alvin R*., *supra*, 108 Cal.App.4th at p. 971.)

*Analysis*

Mother's only court-sanctioned opportunity for contact with C.C. for the entire 18-month period of reunification was supervised letter and gift exchange. Although the juvenile court granted the department discretion to arrange therapeutic supervised visitation and family counseling, its decision to uphold its detriment finding prevented the department from exercising its discretion.

Ordinarily, our review would be limited to that period following the last reasonable services finding, which if unchallenged is final and binding. However, by

17

combining the review hearings and determining the reasonableness of reunification services for the first time at the 18-month review hearing, the juvenile court left open the question whether mother was provided reasonable visitation during the entire reunification period. We conclude, as we now explain, that she was not.

C.C. was removed from mother's custody because mother disciplined her excessively, resulting in visible physical injury. C.C. said she was afraid of mother and did not want to visit her or reunify with her. Each time the issue of visitation was raised, C.C.'s attorney opposed it. Understandably, the juvenile court initially found that it would be detrimental for C.C. to visit mother and ordered no visitation. However, by the dispositional hearing, the court had granted the department discretion to arrange therapeutic supervised visitation, which the department supported but was prevented from executing because of the court's detriment finding. The department foresaw even at that early point that mother's prognosis for reunifying with C.C. was very poor because C.C. did not want to return to her custody.

In February 2019, approximately eight months after C.C.'s removal, mother's attorney petitioned the juvenile court to order therapeutic supervised visits, which the court denied, upholding its detriment finding and finding visitation was not in C.C.'s best interest. At that time, C.C. was having emotional problems, significant enough to warrant involuntary detention in a psychiatric facility. She had also engaged in a physical altercation with a roommate in her group home and ran away from foster care. However, at the same she was contacting mother every day by cellphone. In March, she told her social worker she wanted to visit mother on weekends, just before she ran away.

In April 2019, ten months into the reunification period, mother's attorney requested supervised visits. The court denied the request, stating:

"THE COURT: [Y]ou are more than welcome to bring that proposed change in the form of a JV-180, but given the minor's recent history—meaning the fact that she was AWOL for some time—and the

18

idea that the current order is for therapeutic supervised visits, the Court is not inclined to progress those visits without more information. So if that information is out there, please bring that to the Court's attention in the appropriate form of a [section 388 petition], and we'll certainly address that matter.

"I'm not going to provide the Department with discretion at this time. If this is appropriate and any party is seeking to have visits progress, please file that in the form of a [section 388 petition]."

In July 2019, more than a year after C.C. was removed from mother's custody, the department asked to arrange therapeutic supervised visitation and/or family therapy. However, after conferring with C.C. in chambers, the juvenile court deferred ruling on the request until the contested review hearing. The department's recommendation for the hearing was to terminate reunification services. In July, county counsel informed the court C.C.'s therapist believed visitation would be detrimental. The therapist subsequently refused to provide an opinion on visitation, deferring instead to C.C. In December 2019, the juvenile court admonished mother for having unsupervised communication with C.C. by text message and social media.

At the contested hearing in January 2020, C.C.'s former foster mother testified that sometime around July 2019 she supervised regular telephone contact between mother and C.C. while C.C. was in her care. They also had in-person contact on one occasion when she took C.C. to meet with mother to pick up some clothes. They interacted like mother and daughter, laughing and talking. Social worker Wright testified he did not pursue therapeutic supervised visitation because of the court's detriment finding and C.C.'s unwillingness to visit mother. Mother testified C.C.'s therapist contacted her in April, May and December 2019 to schedule an appointment. Social worker Martell testified she was aware C.C.'s therapist tried to contact mother and advised her it was inappropriate. The therapist was still requesting a one-time session so C.C. could express her feelings directly to mother. C.C. testified she never wanted to visit mother but when asked if she *would* want to visit mother, she was not sure, stating, "Um, just see how it

19

goes." She was not sure if she would want to visit mother after a one-time session with mother and her therapist. She told mother in a letter that she wanted to come home but only because mother paid her to say it.

The juvenile court found the department provided mother reasonable reunification services. As to visitation, the court commented only on mother's violation of its visitation order by initiating text messaging with C.C. and offering her money to write a letter stating she wanted visitation. The court did not believe it delegated the choice to visit to C.C.

The question we must answer is whether supervised letter and gift exchange was reasonable under the facts as summarized above. We conclude C.C.'s emotional volatility justified it but only to a point. We must also consider that the juvenile court considered the matter in February 2019 and found it was not in C.C.'s best interest to visit mother even under therapeutic supervision. However, C.C. had been out of mother's custody for eight months and the issue of visitation had yet to be adjudicated through a review hearing on services. Further, the court did not conduct a hearing to examine the evidence in favor of arranging therapeutic supervised visitation and at that very time mother and C.C. were regularly conversing by telephone. Had the court conducted a hearing on mother's section 388 petition, it may have ruled differently or this court may have reversed the court had mother's attorney appealed from the court's denial order. However, that is not before us. In any event, in April 2019, mother's attorney requested supervised visitation. Around this time, C.C.'s therapist was trying to arrange a joint therapy session. Although the court was willing to consider evidence favoring increased visitation, it placed the burden on mother to prove visitation served C.C.'s best interest by requiring her attorney to file a section 388 petition. Instead, the court could have directed the department to file a report addressing visitation and the appropriateness of advancing beyond supervised letter and gift exchange. Since the court's no-contact

20

order had deprived mother of the ability to see or speak to her daughter for nearly a year and in the interest of protecting mother's interest in the care and companionship of her daughter, it only seems reasonable that the department should provide the court the information it needed to determine whether it was safe for mother and C.C. to progress to therapeutic supervised visitation and family therapy. Two months later, in June, the department asked to arrange therapeutic supervised visitation and family therapy. However, the court deferred to C.C. and her therapist at a time when, according to the foster mother, mother and C.C. were having regular telephone contact, which C.C. was enjoying. Unfortunately, much of the evidence favoring therapeutic supervised visitation and family therapy was produced after 18 months of reunification efforts and at the only hearing at which the reasonableness of reunification services was addressed.

Our dependency courts routinely face difficult choices in crafting orders affecting the lives of parents and their children. The minor here was subjected to abusive treatment which required the court's protection. She exhibited behaviors that reflected distress in the course of being placed in various foster care settings. While generally declining to have contact with her mother, she did vacillate at times when she did voluntarily engage in phone conversations that appear to have been positive experiences. Thus, while we conclude the court's ongoing detriment finding rendered visitation unreasonable after a certain point, we do not minimize the difficulty faced by the court in tailoring approaches that fulfill its duty to uphold the liberty interests of parents while assuring the safety and well-being of the children under its supervision.

In this case, mother's only hope for repairing her damaged relationship with C.C. and reunifying with her was to work through their issues in a therapeutic setting. However, the juvenile court made that impossible by forbidding in-person contact. While the evidence supports its decision for an initial period, it does not support depriving her of that for an entire 18-month period. We conclude based on the evidence the court's

21

no-contact visitation order was not reasonable sometime around February 2019 and afterward.

Real party in interest contends the no-contact order was justified because mother failed to make sufficient progress in her CAIP. While a parent's progress in court-ordered services is an important consideration in evaluating the child's safety and the prospects for return, it cannot be the deciding factor preventing any parent/child contact in a case such as this where there is no evidence that such contact would be detrimental to the child and where there are no prospects for reunification without it.

We turn then to the issue of remedy. Ordinarily reunification services are available to a parent for a maximum of 18 months from the date the child was physically removed from parental custody. (§ 361.5, subd. (a)(3)(A).) The 18-month limitation on reunification services in this case had been reached by the contested hearing in January 2020. However, courts have held that where "a timely challenge to the adequacy of services for the statutorily required minimum period—here, 12 months—is sustained, that failure to provide services will justify the extension of services beyond 18 months, even without a showing of best interests of the child or substantial probability of return, and even if the permanent plan is not to return the child to the parent." (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1256; *Alvin R.*, *supra*, 108 Cal.App.4th at p. 975 ["The remedy for a failure to provide reasonable reunification services is an order for the continued provision of services, even beyond the 18-month review hearing."]; see *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1778–1779 [rejecting argument that a section 366.26 hearing must be set "at the 18-month review, even in the absence of a finding that reasonable services have been provided," concluding instead that "the court has discretion upon a showing of good cause to continue juvenile dependency hearings beyond the statutory time limits"].) We agree and shall direct the juvenile court to

provide mother with an additional period of reunification services, even beyond 18-months.

## DISPOSITION

The petition is granted. Let an extraordinary writ issue directing the juvenile court to vacate its January 16, 2020 finding that reasonable services were offered or provided to mother and its orders terminating reunification services and setting a section 366.26 hearing. The court shall enter a new and different finding that reasonable services were not offered or provided to mother. The court shall set a continued 18-month review hearing at the earliest convenient time and direct the department to file an amended case plan incorporating family therapy and therapeutic supervised visits and any other services that would enhance mother's relationship with C.C. At the continued 18-month review hearing, the juvenile court shall provide mother an additional period of reunification services. This opinion is final in this court on filing. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

Filed 7/24/20

**<u>CERTIFIED FOR PUBLICATION</u>**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SERENA M., | F080612 |
| Petitioner, | (Super. Ct. No. 18CEJ300170-1) |
| v. | |
| THE SUPERIOR COURT OF FRESNO COUNTY, | **ORDER GRANTING REQUEST FOR PUBLICATION** |
| Respondent; | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, | |
| Real Party in Interest. | |

On July 21, 2020, this court received and filed a request for publication of the nonpublished opinion filed on June 30, 2020, in the above-entitled matter. It appearing that the nonpublished opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), IT IS ORDERED that the opinion be certified for publication in the Official Reports.

POOCHIGIAN, A.P.J.

WE CONCUR:

PEÑA, J.

SNAUFFER, J.