Filed 7/17/23  C.H. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| C.H.,<br><br>  Petitioner,<br><br>  v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>  Respondent;<br><br>FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>  Real Party in Interest. | F086120<br><br>(Super. Ct. Nos. 0094116-3, 0094116-4, 0094116-5)<br><br><br>**OPINION** |

### THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Mary Dolas, Judge.

Chineme Anyadiegwu for Petitioner.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Carlie Flaugher, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]    Before Poochigian, Acting P. J., Meehan, J. and De Santos, J.

Petitioner C.H. (mother) seeks an extraordinary writ (Cal. Rules of Court, rule 8.452) from the juvenile court's orders issued at a combined 12- and 18-month review hearing terminating her reunification services and setting a Welfare and Institutions Code section 366.26 hearing[1] as to her sons, Z.C. (born May 2009), J.P. (born January 2013), and B.J. (born August 2018) (collectively the children). Mother contends the juvenile court erred in finding that the Fresno County Department of Social Services (department) provided reasonable services and in finding that there was a substantial risk of detriment in returning the children to mother's care and custody. We deny the petition and mother's request for a stay.

## PROCEDURAL AND FACTUAL HISTORY

On May 9, 2021, mother was involuntarily hospitalized pursuant to section 5150, due to her involvement in an altercation with another individual in a public place. The following day, mother reported to hospital personnel that her children were home alone. The home was discovered to be unsanitary and unhealthy for the children, including dirty dishes in the kitchen; trash, boxes and miscellaneous items strewn on the floor; cockroaches in and out of open food containers; open medications, alcohol and knives accessible to the children; and lack of food in the refrigerator. The children were placed on a section 300 protection hold.

At a May 12, 2021, team decision making meeting, the department determined that voluntary family maintenance services was not appropriate and a safety plan could not be developed. At the meeting, mother blamed the state of the house on the children, denied a lack of food in the house, and said the children knew not to touch the medication, alcohol or knives. Mother denied any drug use except for daily marijuana

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

use. Mother reported being compliant with her mental health medication but said it was not working.

The department filed a section 300 petition on behalf of the children alleging, pursuant to subdivision (b)(1), general neglect by mother due to her failure to adequately provide for the children.[2] An amended petition was filed May 13, 2021, which just appears to change mother's birthdate, nothing else.

*Detention*

At the detention hearing May 13, 2021, the children were detained and the juvenile court made a preliminary order requiring the department to offer mother random drug testing only, as well as visitation. A jurisdiction hearing was set for June 3, 2021. A second amended petition was filed May 28, 2021, which added an allegation under section 300, subdivision (j), that the children were at risk of abuse and neglect "similar to their [three] half-siblings," who had all been removed from mother's care and her rights to them terminated.

*Jurisdiction*

The department's jurisdiction report dated June 1, 2021, requested the juvenile court find the section 300, subdivisions (b)(1) and (j)(1) allegations true. The department also requested a 30-day continuance of the disposition hearing on grounds that the department needed to determine whether services should be provided mother, as she met the bypass provisions of section 361.5, subdivision (b), based on her prior dependency history.

At the jurisdiction hearing June 3, 2021, the juvenile court granted the department's request and continued the matter. Mother contested the jurisdictional allegations and requested a contested hearing. Settlement conference for contested

---

[2] The whereabouts of alleged fathers, M.C., S.P., and V.J. was unknown. None are a party to this writ petition.

3.

jurisdiction was scheduled for August 12, 2021, and a trial date for August 24, 2021. The dates for disposition were set for the same.

*Jurisdiction and Disposition*

On August 23, 2021, the department filed a disposition report maintaining there was a substantial risk of detriment to the children if they were returned to mother at this time and recommended that mother be ordered to participate in family reunification services. The report noted mother's acknowledgement of her bipolar disorder and her claim the medication she was prescribed in the past had not worked for her, resulting in her use of marijuana to manage her medical issues. Mother also had a prior dependency case in which her children were removed from her care due to her leaving them at home unsupervised in similarly unsafe conditions, resulting in her parental rights being terminated in 1999 and 2001. Since then, mother had raised another son, Z.A., to adulthood without department intervention.

The department's report indicated that, due to mother's past history, various bypass provisions were currently applicable. However, mother was now taking responsibility for her circumstances and stated she was committed to stabilizing her mental health and providing a safe environment for the children.

At the jurisdiction and disposition hearing August 24, 2021, the juvenile court found the allegations of the petition true, removed the children from mother's care, and placed them into foster care. Visitation was continued and mother was ordered to participate in family reunification services, including parenting classes, mental health assessment and recommended treatment, drug abuse assessment and recommended treatment, domestic violence index, and random drug testing. The August 31, 2021, date was vacated and a six-month review hearing was set for February 22, 2022.

*Six-Month Review*

The report filed by the department for the six-month review recommended that the children remain in out of home care and family reunification services continue for

mother. The report stated mother was still residing in the two-bedroom apartment where she had lived with the children, she was employed, and she acknowledged that she was exposing her children to an unhealthy environment due to her own mental health struggles. Mother was participating in mental health services and had taken steps to find a new doctor able to prescribe appropriate medication.

Mother began parenting classes in late September 2021. Mother reported to the social worker that the class had taught her how to appropriately discipline her children and the importance of feeding them healthy food. Mother had not completed the parenting class as yet and needed to submit "homework and her journal" to earn her certificate of completion.

Mother had a substance abuse assessment September 1, 2022, and it was recommended that she participate in outpatient substance abuse treatment, which she started in mid-September. After mother tested positive for marijuana, it was determined that mother had a prescription for marijuana to treat pain for a previous hip injury and, in light of that, she did not require substance abuse treatment. However, on January 3, 2022, mother tested positive for opioids, which was later determined to be a false positive, and on January 25, 2022, mother tested positive for cocaine. Mother insisted this was false and broke off communication with the substance abuse specialist. Between January 3 and January 25, mother had eight no shows in a row for drug testing.

Mother consistently visited the children, which were deemed positive, although Z.C. had to be constantly reminded to put his cell phone away. The two older children missed mother and wanted to go home. The visits were supervised as unsupervised visits were postponed due to the issues with her drug tests.

Mother completed a domestic violence inquiry in early January 2022, and it was recommended that she complete the Child Abuse Intervention Program, a 52-week course. Mother stated she was not in agreement with the recommendation.

5.

Reunification services for mother were continued and a substance abuse assessment ordered. A 12-month review was scheduled for July 26, 2022.

*12-Month Review*

The report for the 12-month review hearing recommended that reunification services for mother be terminated and a section 366.26 permanency plan hearing set. The department opined that mother had not "fully ameliorated the circumstances that brought the family to the attention" of the department, noting her history of substance abuse and limited parenting skills.

The report stated that mother had completed her parenting program, was participating in weekly mental health treatment, had completed only 15 out of 52 Child Abuse Intervention Program sessions, and was reported to be in the early stages of change, which was why the department was recommending that services be terminated. Mother began participating in outpatient substance abuse treatment in March of 2022, and continued to test positive for marijuana. She did not show for one random drug test. Visits between mother and the children went well, but remained supervised. Mother failed to follow through on a behavior plan for Z.C., which was to address his poor behavior in school. Mother said she did not want to take away his cell phone as she had been asked to do, and said she would parent him when he returned to her home for care.

At the July 26, 2022, hearing, mother objected to the recommendation for termination of services and requested a contested hearing, which was set for November 29, 2022. On the trial date, mother's counsel requested a continuance to prepare for trial, which was granted, and the matter continued to March 16, 2023. That hearing date was subsequently continued to April 14, 2023.

*Combined 12- and 18- Month Review Hearing*

At the combined March 16, 2023, 12- and 18-month review hearing, the social worker supervisor Ms. Yang was first asked about one of the children, J.P., whom she reported was in a short term residential therapeutic program (S.T.R.T.P.), as he was

6.

exhibiting "behaviors" at home and school, and was suspended on a regular basis from school. J.P. was described as impulsive, easily upset, and he would throw items at peers and staff. Mother submitted on the placement for J.P.

As for the contested hearing, the department called social worker Debra Chavira, who testified that she was assigned mother's case in February of 2022. Chavira testified that mother's visits went from supervised to intensive supervised visits at the end of December 2022, due to behavioral concerns of the children, including biting, physically hitting and fighting, throwing items, and kicking staff, and in one instance, flipping a table. It was reported that mother was unable to control the children's behavior. Mother was told of the need for intensive supervised visits on October 26, 2022, but was resistant, claiming they conflicted with her schedule. This resulted in a two-month delay before mother could continue visits. While mother was counseled about her children's behavior issues, she did not correct them but, at most, talked to them.

Mother's oldest child Z.C., displayed behaviors of isolation, depression, verbal and physical aggression, lying, and was caught vaping at school and had to be transferred. However, even at the new school, there were concerns about Z.C.'s substance abuse, behavioral outbursts, cell phone use, and an incident where he brought a toy gun to school. While mother listened to Chavira's concerns about Z.C., and stated she was in agreement, Chavira testified that mother was not willing to enforce any rules with him, including taking his cell phone from him when asked to do so. Z.C. was receiving "WRAP services" to help him in the community as well as at home and at school. Mother was invited to the weekly WRAP meetings, but had not attended consistently.

J.P.'s behavior was described as very impulsive and he was verbally and physically aggressive. He destroyed items and hit other students. Mother had not demonstrated that she was willing to work with the plan set out by department or the S.T.R.T.P. Meetings to discuss J.P.'s progress were difficult to schedule due to mother's

changing schedule. J.P.'s behavior had actually regressed since mother started intensive supervised visits. Due to J.P.'s need for constant attention, it was decided to allow him to make phone calls to mother when he was having difficulty. However, mother was inconsistent in making this happen.

The youngest child, B.J., was physically aggressive in school. He recently began receiving mental health and therapeutic behavioral services.

Chavira testified that the detriment to returning the children to mother's care at this time was the individual needs of the children and the support they needed on a day to day basis. Chavira testified that mother had not demonstrated the parenting necessary to meet the needs of the children due to her "inability to follow through with the plan and inconsistently attending meetings and being willing to be flexible with her schedule, in regards to her children's needs." Chavira opined that the concern would be "the safety of the children. In regards to … the oldest child and substance abuse, the middle child and his aggressive behaviors, he tends to physically fight with the older child, and the youngest child, considering his age, would be really unwilling to defend himself, if anything like that was to happen, since they all display … physical aggression."

Chavira acknowledged mother had completed her parenting program and was addressing her substance abuse issues, was almost done with the domestic violence index sessions, and continued in her mental health therapy. While mother was able to explain what she had learned, she was "not able to apply it to those visits and the concerns of the behaviors of the children."

Mother testified that the parenting class had taught her "how to be a better parent" — conflict resolution, having family meetings, family rules, morals and values, and teaching the children self-worth. She had learned anger management in the Child Abuse Intervention Program. Mother explained that she, at first, tested positive for medical marijuana, but later tested negative because she learned she did not need "mind altering substance" to control her pain. She had been sober for a year.

Mother testified that, when she was first offered intensive supervised visits due to the children's behavior, it conflicted with her schedule and visits had to be postponed for "those weeks" while she was on a waiting list for a better time slot.

Mother described Z.C.'s behavior as including vaping, "suspected" marijuana use, hanging out with the wrong crowd, and being tardy to school, which she claims she talked to him about. Z.C.'s response was that he did not get along with his care provider. She thought she had attended two or three of the WRAP meetings scheduled for him. Mother was asked why she did not take Z.C.'s phone away from him when asked to do so by the department, and mother said she did not have a chance because he did not bring it to any subsequent visits. She acknowledged she may have missed a few visits when she was sick.

Mother testified that her children came first, but that she needed to make sure she took care of herself as well. She described J.P.'s behavior issues as "attention seeking," and she had learned "positive ignoring." She thought she had attended about three of J.P.'s S.T.R.T.P. meetings.

In closing, the department argued that the children had been removed from mother's care almost two years earlier, and mother had had many opportunities to complete her programs. While she completed her parenting class, she had not done so until early January 2022, and her substance abuse treatment program until November of 2022. She had not yet completed her domestic violence index. The department described mother's behavior as "self-sabotaging," and because of her delay in completing services, she failed to progress to unsupervised visits with the children. Each of the children had very specific and difficult challenges, but mother had taken no initiative on her own to address those issues. J.P. had been placed on a 5150 hold at one point after threatening to harm himself, and was later diagnosed with ODD and received mental health services. B.J. was receiving speech services and services for his aggressive behavior. The care provider had had to pick him up early from school three times a week due to his behavior.

9.

The department did not have any evidence that mother would be able to provide for the care of the children if they were returned to her at that point.

The children's counsel joined in the department's argument and agreed with their position to terminate services.

Mother's counsel argued that mother had "consistently" visited the children, attended ordered programs and was making significant progress. Counsel described mother's visits as including "a good conversation" with the children, and argued that the children did not have behavioral issues prior to being detained, but "[e]verything started after removal," including Z.C.'s use of marijuana. Counsel argued that mother's marijuana use, which had been prescribed for her, was incorrectly used by the department to keep from advancing visits from supervised to unsupervised. Counsel also argued that the department erred when it failed to advance her visits because she did not take Z.C.'s phone away from him, arguing she was not able to do so because he did not bring it to any subsequent visits.

Mother's counsel acknowledged that mother didn't "jump" at the opportunity to schedule intensive supervised visits after it was reported that her children had been fighting prior to a visit, but counsel claimed mother did not know what specifically intense supervised visits were, she was not present when the fight broke out, and she was concerned about keeping her employment. As such, counsel argued that reasonable services were not offered mother and asked that the juvenile court extend services to "beyond the 18 months period."

Counsel for the department recapped that the children were not removed from mother's care initially "just because of her marijuana use," but included a "plethora" of reasons — mother's untreated mental health issues, her bipolar disorder, her 5150 hospitalization after an altercation, leaving the children unsupervised, unsanitary and unhealthy conditions in the home with medications and knives accessible to the children, and a lack of food. Counsel argued that, if mother "wanted to provide the adequate care

10.

that she's claiming she can provide … she should have done so already given that she's had … prior reunification services terminated and parental rights terminated in the past due to her substance use and positive toxicology for cocaine, emergenc[y] birth, unsafe and unsanitary conditions with regards to the minors' older siblings. This is history repeating itself."

Counsel for the department argued that mother made it clear during a Child Focus Team (CFT) meeting that it was the care providers job to discipline the children and not hers, as that is what they are paid for, and she would discipline them when they got home. Counsel noted J.P.'s regression in behavior when visits restarted with mother after intensive supervised visits began; the fact that J.P. had had behavioral issues since kindergarten; and mother's claim that Z.C. did not bring his cell phone (which mother gave him) to visits was not true as visitation notes stated he was constantly reminded to put it away. Counsel argued that, throughout the pendency of the case, mother had "done nothing but delay her progress with visits or otherwise blame the department for the issues that gave rise to this petition being filed." Counsel argued that mother had not taken responsibility for what brought the children into the system, and two years later, mother was still "unable to show that the [children would] be safe back in her care." Counsel asked that the juvenile court terminate reunification services for mother.

The juvenile court stated that, based on all the evidence presented, it found the department had provided reasonable services, including making available visits and "the opportunity to progress visits." The juvenile court found mother's progress to be moderate. While mother was testing negative and had participated in many of the services ordered for her, the case was "running out of time," and there was no evidence to support the fact that there was a substantial likelihood the children could be returned to mother's care at the 24-month period, which was "within the next few weeks." The juvenile court found that, while there was information about having a safe and appropriate home, no actual evidence of such was presented. And "more importantly, no

11.

evidence presented regarding mother's ability to on her own properly supervise and provide for her children." While mother could identify some of what she had learned in her classes, even during supervised visits concern remained about mother's ability to properly manage, protect and supervise the children. The juvenile court found return of the children to mother would still create a risk of detriment, therefore continued placement was necessary, and reunification services were terminated. A section 366.26 hearing was set for August 10, 2023.

## DISCUSSION

### *Reasonableness of Reunification Services*

Mother contends first that the reunification services provided by the department were not reasonable and tailored to her needs. Mother does not argue that the department failed to provide adequate drug testing, drug treatment services, or mental health services, but contends specifically that the department's reliance on her medical marijuana use and a false positive drug test hampered her ability to progress visitation. We disagree and find clear and convincing evidence to support the juvenile court's finding that the department provided reasonable services to mother.

The court's reasonable services finding "must be made [by] clear and convincing evidence." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.) We review the finding that reasonable services had been provided or offered for substantial evidence. (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598.) "In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) In other words, "the question before a court reviewing a finding that a fact has been proved by clear and convincing evidence is not whether the appellate court itself regards the evidence as clear and convincing; it is whether a

12.

reasonable trier of fact could have regarded the evidence as satisfying this standard of proof." (*Id.* at p. 1009.)

"In a juvenile dependency proceeding, a parent generally has a statutory right to reunification services when his or her child is removed from the parent's custody at a disposition hearing." (*In re M.S.* (2019) 41 Cal.App.5th 568, 590, disapproved on another ground in *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 631, fn. 8; see § 361.5, subd. (a).) Reunification services are among the "[s]ignificant safeguards" that are built into the current dependency scheme. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307–308; accord, *In re M.F.* (2019) 32 Cal.App.5th 1, 13 ["Family reunification services play a critical role in dependency proceedings."], disapproved on another ground in *Michael G. v. Superior Court, supra,* at p. 631, fn. 8.) Reasonable services mean "those efforts made or services offered or provided by the county welfare agency or probation department to prevent or eliminate the need for removing the child, or to resolve the issues that led to the child's removal in order for the child to be returned home, or to finalize the permanent placement of the child." (Cal. Rules of Court, rule 5.502(33); see § 300.2 [the "safety, protection, and physical and emotional well-being [for the child] may include provision of a full array of social and health services to help the child and family and to prevent reabuse of children"].)

The services offered by the agency must be "reasonable 'under the circumstances.' Such circumstances necessarily include the mental condition of the parent, her insight into the family's problems, and her willingness to accept and participate in appropriate services." (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.) Under section 361.5, the agency is required to make " '[a] good faith effort' to provide reasonable services responding to the unique needs of each family." (*In re Monica C.* (1994) 31 Cal.App.4th 296, 306.) But a good faith effort is not the equivalent of perfection: "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided

were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

The adequacy of the department's plan for reunification and the reasonableness of its efforts must be determined by the circumstances of the particular case. (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) One of the components of a reunification plan must be visitation, which must "be as frequent as possible, consistent with the well-being of the minor." (*In re Luke L.* (1996) 44 Cal.App.4th 670, 679; see also *In re Lauren Z.* (2008) 158 Cal.App.4th 1102, 1113-1114, dis. opn. of Rothschild, J. ["Visitation is a critical component, probably the most critical component, of a reunification plan."].)

Viewing the record as a whole, there was substantial evidence from which the juvenile court could find by clear and convincing evidence that the department provided mother with reasonable reunification services.

The children were detained in May of 2021 after mother was involuntarily hospitalized pursuant to section 5150 following an altercation with another individual. The children were found home alone in unsanitary and unhealthy conditions. Mother's mental health, her substance abuse and neglect of the children, as well as her previous dependency history, were at issue. The reunification plan for mother included mental health and substance abuse assessment and treatment, random drug testing, domestic violence index, a parenting class, and weekly visitation. Mother's complaint is that the department used her drug use as a reason for not progressing visitation from unsupervised to supervised. It is true that mother provided a prescription for medical marijuana to the department early on and that she was told, in September of 2021, by a substance abuse specialist, that she could continue progressing in her case as long as she was not using marijuana in the presence of the children. However, this evidence pertained to the six-month review period, which is not at issue here, as mother is contesting the reasonableness of services in the combined 12- and 18- month review period.

14.

Our review is "limited to that period following the last reasonable services finding, which if unchallenged is final and binding." (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 675.)  Here, the relevant period is between the 12-month and 18-month review hearing.  Mother has the burden to demonstrate the evidence is insufficient to support the juvenile court's finding that the department provided reasonable services during this time period.  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Following the six-month review period, mother continued to test positive for THC, although her medical marijuana prescription expired in May of 2022, and she chose not to renew it.  Mother then tested negative from June 2022 to June of 2023, with the exception of a refusal to test once in January of 2023.

The social worker at the 12- and 18- month review hearing testified that mother's continued marijuana use was the reason why mother's visits did not initially progress, but it was mother's failure to display proper parenting skills to deal with the children's behavioral needs that kept the visits from progressing.  While mother showed affection and engaged with the children at visits, and brought them food, drinks, clothes, and gifts, she failed to address the children's behavioral issues.  Z.C.'s cell phone use during visits was a constant issue and, despite being told she needed to take it away from him, mother failed to do so, expressing that it was not her job to do so.

As evidenced in the 18-month review report and testified to at the hearing by the social worker, at one visit the children were fighting at the visitation center, including flipping over a table and not listening to mother.  J.P. kicked staff at the visitation center and hit B.J.  As a result, the visit had to be cancelled, and the behaviors led to the need for more supervision at the visits.

The department held a series of meetings and offered mother the opportunity to participate in decisions affecting the children's health, education and behaviors.  This included needing to see mother implement an action plan to address Z.C.'s behavior and enforce consequences.  In June of 2022, when asked to follow through on a plan to

15.

remove Z.C.'s phone from him, mother agreed but then refused to follow through, stating she did not want to take it and she would parent when he returned to her home. Because of mother's failure to follow through on this plan, the department concluded in July of 2022, that visitation should not progress to unsupervised.

By October of 2022, after the children engaged in the previously mentioned fight at the visitation center with mother present, the visitation center staff reported that mother could not control the children during visits and insisted that visits take place with an additional level of supervision. These visits — "intensive supervised visits" — provide for additional staff to help mother with control over the visits.

Mother was told of this decision immediately and was given the option to move her conflicting domestic violence class to allow for uninterrupted visitation with the children, but she rejected the available time slot, citing a class and her work schedule. As a result, mother was waitlisted for a more convenient time for her and, as a result, did not visit the children between October 26, 2022, and December 2022.

During this review period, J.P. was placed in a short-term treatment facility and Z.C. was given WRAP services, to assist each in their individual mental and behavioral issues. Mother was invited to attend the meetings for each child in addressing their needs, however she was not consistent in her attendance at those meetings.

As summarized by the social worker's testimony, mother "always says she's in agreement with the next steps," but then did not demonstrate a willingness to follow through. While mother was given the opportunity to be a more active participant in the issues affecting her children, she was inconsistent and, ultimately, her inability to apply parenting skills to address these issues, where provided the opportunity, became the primary reason mother was not progressed in visitation services.

Mother has not satisfied her burden. The record is replete with evidence that she received adequate visitation and the department did not impede her ability to progress to unsupervised visits due only to her past substance use. The record also contains evidence

16.

that the department encouraged mother to make her mental health a priority, offered domestic violence classes, a parenting class, helped her to attain sobriety and achieve the other objectives of her case plan. Despite these efforts, mother "self-sabotaged" the plan throughout the dependency by not following through and delaying active efforts to help her reunite with her children. Together, this evidence amply supports the juvenile court's finding that the department's efforts were reasonable under the circumstances. (*In re Misako R., supra,* 2 Cal.App.4th at pp. 545-547.)

<u>Detriment</u>

Mother also argues the juvenile court committed reversible error in finding it would be detrimental to return the children to her care at the 18-month review hearing, and that it should have returned them to her on family maintenance. We conclude the evidence was sufficient to support the court's finding of detriment.

"The Legislature has determined the juvenile court may generally offer family reunification services for a maximum period of 18 months. [Citations.] At the 18-month permanency review hearing the juvenile court must order a child returned to a parent's custody unless it finds, by a preponderance of the evidence, that return of the child will create a substantial risk of detriment to the child's safety, protection or physical or emotional well-being." (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864, fn. omitted; see § 366.22, subd. (a).) If the child is not returned to a parent at the permanency review hearing, the court must terminate reunification services and order a hearing pursuant to section 366.26. (§ 366.22, subd. (a)(3).)

"The juvenile court's detriment finding is reviewed under the substantial evidence standard." (*In re A.J.* (2015) 239 Cal.App.4th 154, 160.) "[T]he reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.] In

17.

dependency proceedings, a trial court's determination will not be disturbed unless it exceeds the bounds of reason." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)

Section 366.22 provides that "[t]he failure of the parent ... to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.22, subd. (a)(1).) Here, the juvenile court found mother's progress to be "moderate," and there was no substantial probability of return of the children to mother's care by the 24-month date, which was only about a month away.[3]

Mother asserts that the children were removed from her care because she was involuntarily hospitalized pursuant to section 5150 due to an altercation that took place outside the home. According to mother, there was no domestic violence in the home and the children witnessed none, nor was there any allegation of physical abuse of the children. Mother also reiterates that her marijuana use was for pain, with a prescription, and no abuse of marijuana was reported. Mother does acknowledge her need for mental health treatment, but claims she was receiving such help. And her home, which at the time of detention was dirty and unsafe for the children, had been rectified.

However, the mere completion of a case plan is not sufficient to have a child returned to a parent, as the court is required to "consider the efforts or progress, or both, demonstrated by the parent ... and the extent to which they availed themselves of services provided." (§ 366.22, subd. (a)(1); see *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1139-1141.)

---

[3]    Section 361.5, subdivision (a)(4)(A) provides that court-ordered services may be extended up to a maximum time period not to exceed 24 months after the date the child was originally removed from physical custody of the child's parent or guardian if it is shown that the child will be returned and safely maintained in the home within the extended time period.

The juvenile court acknowledged that mother had participated in many of her court-ordered services and had reached a year of sobriety by the time of the April 14, 2023, ruling. However, mother's sobriety was still relatively new, especially in light of her history of abuse. But more importantly here, mother was still not able, after all of the provided services, to, as the juvenile court described it, "provide appropriate care, supervision, and protection" of the children. The juvenile court noted that, while mother was testing clean for close to a year and was able to identify what she had learned in parenting class, she could not manage the children in even a supervised visitation setting.

This inability to demonstrate proper parenting skills was concerning since Z.C. had significant behavioral issues that needed to be addressed — his marijuana use, getting into trouble at school, and in need of WRAP services. So too for J.P., who was placed in a short term, residential treatment facility, and needed intensive supervision and attention, and J.B. who had behavioral issues with aggression at school. The lack of initiative mother showed in engaging in meetings or taking responsibility for disciplining her children does not bode well for a claim that home life with her would be different.

In light of the evidence, we cannot say the juvenile court's determination that return of the children to mother's care would create a risk of detriment to their emotional well-being exceeded the bounds of reason. Therefore, we will not disturb its determination. (*In re Ricardo L., supra,* 109 Cal.App.4th at p. 564.)

## DISPOSITION

Mother's petition for extraordinary writ is denied. We deny mother's request to stay the section 366.26 hearing.